FOURTH DIVISION
March 31, 2008

No. 1-06-0682

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 04 CR 17227 |
| | ) | |
| RAUL TIJERINA, | ) | Honorable Stanley J. Sacks, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Following a jury trial, defendant, Raul Tijerina, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) and intentional homicide of an unborn child (720 ILCS 5/9-1.2(a)(1) (West 2004)) for the July 9, 2000, death of Sonya Garcia. At the time of her death, Garcia was 14 years old, approximately 8 months pregnant, and residing with defendant. The trial court sentenced defendant to 60 years' imprisonment for first degree murder and a consecutive 40 years' imprisonment for the intentional homicide of an unborn child pursuant to sections 5-8-1(a)(1)(a) and 5-8-4(a)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(a), 5-8-4(a)(i) (West 2004)).

On appeal, defendant argues five issues. Defendant claims that the trial court erred in failing to instruct the jury on involuntary manslaughter and second degree murder based on provocation. Defendant contends that he was denied a fair trial because of prosecutorial misconduct during the State's rebuttal argument. Defendant asserts that the State improperly

presented extensive evidence of his relationship with the victim in violation of pretrial assurances not to present evidence of other crimes. Finally, defendant asserts that the sentence of 100 years' imprisonment was excessive. For the following reasons, we affirm the findings of the trial court.

## I. BACKGROUND

In July 2000, Teresa Morgan resided in the first-floor-rear apartment at 4716 South Troop Street. Defendant and the victim had moved into in the second-floor-front apartment of the building sometime in the spring of 2000. Defendant's sister Deana Tijerina lived in the first-floor-front apartment. Morgan assumed that the victim was defendant's girlfriend as she had seen them holding hands and kissing at different times.

At approximately 1 a.m. on July 9, 2000, Morgan and her boyfriend were watching television in her apartment when she heard a female voice hollering "stop hitting me." Morgan went to the front of the building because the woman continued hollering. Morgan heard the woman still hollering and a man speaking in Spanish from the second-floor-front apartment and recognized the voices as defendant's and the victim's. Morgan understood some Spanish and heard defendant hollering "bitch" and "whore." Morgan also heard the sound of someone being hit. After about 10 minutes, Morgan went to the corner to call the police on the pay phone because she did not have phone service in her apartment.

Five police officers arrived on the scene shortly thereafter. When the police knocked on defendant's door, Morgan heard defendant ask what the police wanted. The policeman told defendant to open the door and defendant told the police to "get the f--- away from his door." The police then left and Morgan did not hear any more noise from defendant's apartment that night. A few hours later, Morgan was awakened by a knock on her door from homicide

detectives who informed her that the victim was dead. Morgan admitted to being on probation for a 2003 felony conviction for possession of a controlled substance, but denied being under arrest when she testified before the grand jury.

Officer Chris Hackett of the Chicago police department was dispatched to defendant's apartment at about 1:20 a.m. on July 9, 2000. Hackett, his partner and a sergeant went inside and Hackett knocked on the door to defendant's apartment. Hackett heard movement inside, but no response and knocked again, announcing his agency and requesting that the occupant open the door. A man came to the door and said that he would not open the "f-----g" door. The door was locked and Hackett heard no other voices, crying sounds or indications of a disturbance. The policemen were not advised to enter the residence, so they cleared the job and left the scene at 1:28 a.m. Hackett returned to defendant's residence after a second 911 call was received around 5 a.m. that same morning.

Defendant's sister, Deana, testified that defendant had lived with the victim for a couple months before July 9, 2000. Prior to that, defendant had lived with the victim's mother. Deana testified that their family looked out for defendant because he was not bright and that he could not read or write. She stated that the victim smoked marijuana and that she advised defendant to kick her out, stating that the victim was trouble. Defendant responded to Deana that the victim was like a daughter to him and he did not kick her out of the apartment. Despite this, Deana said defendant and the victim were lovers.

Deana returned home at about 1:30 a.m. on July 9, 2000, and did not see any police or any sign of a disturbance. Later that morning, defendant awoke Deana saying that something was wrong with the victim. Defendant admitted that he had smacked and shaken the victim because she was acting strange and to find out who gave her drugs. Defendant said that the victim was

"acting crazy" and had fought back.

Deana went upstairs to defendant's apartment and found the victim on the bed. Deana described the victim as purple and her face was both purple and swollen, though she did not see any blood. Deana stated that they had to call the police and went down the block to the pay phone with defendant to call 911. After dialing 911, Deana turned around and defendant had disappeared, despite the fact he was not wearing any shoes. Deana did not hear from or see defendant until he was arrested in 2004.

Deana testified on cross-examination that defendant and the victim were not lovers. She only said that they were lovers because the State wanted her to say that they were. Deana had signed a statement and testified to the grand jury that they were lovers and was told that she would be charged with perjury if she changed her testimony. On redirect, Deana stated that she was not changing her testimony and again stated that defendant and the victim were lovers. The trial court denied defendant's motion for a mistrial based on the introduction of evidence of defendant's relationship with the victim and the State's representation it would not introduce other crimes into evidence.

Detective Anthony Padilla was assigned to investigate the victim's death at 5:45 a.m. on July 9, 2000. Padilla arrived at the scene of the crime and found the victim lying on the bed. The victim appeared to be dead with multiple abrasions on her face, her eyes swollen shut, and blood on her mouth, nose, legs, and clothing. Padilla moved the victim's body to check for other injuries. Padilla also observed blood on the wall of the living room, on the hallway, on a cooler near the bedroom and on the blades of a fan. Three blood swabs taken from these areas were each identified as the victim's blood. Though she appeared to have been beaten, the victim's death was initially classified as a noncriminal matter.

The incident was eventually assigned to the cold case squad. In May 2004, Detective Richard Milz learned that defendant was living in Carrizo Springs, Texas, and he obtained a warrant for defendant's arrest. Milz traveled to Texas with Padilla, two other police officers and Assistant State's Attorney Lou Longhitano. With assistance from Texas Rangers, the officers located defendant and followed him to his home, eventually finding him hiding in the garage. Defendant was arrested and taken to a jury room in the Dimmit County Courthouse, advised of his rights and questioned.

Milz testified that when defendant was asked if he knew why they were there, defendant put his head down and indicated that he knew. Defendant told the officers that the victim was his girlfriend and she was eight months pregnant with his baby when she died. Defendant stated that on July 9, 2000, he woke up from a nap to find the victim glassy-eyed and he thought she might be using drugs. When the victim denied taking any drugs, defendant slapped her 13 to 15 times across the face. The victim still maintained that she did not take any drugs and defendant stated that he went back to sleep and when he woke up, the victim was dead on the floor.

Milz told defendant that they did not believe defendant and they had information from the medical examiner, including a list of the injuries suffered by the victim. Defendant lowered his head, began to cry and admitted that he was not telling the whole truth. He admitted to also hitting the victim with a closed fist a couple times, causing her lip to swell and bleed, and biting her on her back and shoulder two to three times. Defendant then admitted to choking the victim for three or four minutes until she fell off the bed crying and gasping for air. The victim continued to deny using any drugs and defendant went back to sleep.

When defendant awoke, he said that she was dead on the floor and he picked her up, put some clothes on her and went to tell Deana what had happened. Defendant admitted that he fled

while his sister called 911 because he was scared and did not want to be around when the police arrived. Defendant stayed at a hotel for a couple days and then took a bus to Texas.

Defendant was informed that Longhitano was a prosecutor and not his attorney. Defendant stated that he understood and agreed to give a videotaped statement to Longhitano. However, the microphone did not work and Longhitano and the detectives had to return to Texas to take a second statement 13 days later. Defendant agreed to give a second videotaped statement that was largely consistent with the first statement. This time, however, Longhitano noticed defendant's top front teeth were missing. Defendant did not say that he lost his teeth during the incident with the victim but, rather, that they were already missing at the time of the incident. Defendant was brought to Chicago, arrested, and charged with murder.

Medical examiner Dr. Adrienne Segovia testified that she performed an autopsy on the victim's body. Segovia stated that the victim was 5 feet 3 inches tall, weighed 171 pounds and presented with numerous injuries. Segovia identified 26 external injuries on the victim including bruises, cuts, and scrapes on her face, forehead and arms, and two bite marks on her arms. In addition, she identified 11 internal injuries, including bleeding into her eyes, three tongue bites, bleeding under the scalp, over the brain and under the skull, and hemorrhages inside the back of her neck. One of the injuries was inflicted after death by someone either moving the body or attempting to resuscitate her and one was a prior injury that had scabbed over. Segovia stated that toxicology screens for alcohol, opiates and benzoylecognine were negative. In addition, within the victim's uterus was a 4.4-pound, 7- or 8-month-old fetus that was normal, but died due to lack of oxygen.

Segovia opined that the victim died as a result of strangulation and multiple blunt force

trauma from the lacerations, abrasions, bruises and subdural hemorrhaging. Segovia admitted that the eye hemorrhaging may be found in cases of obesity, heart failure or when cardiopulmonary resuscitation (C.P.R.) is administered. Though not conclusive proof, Segovia opined the injuries indicated that the victim's death was due to lack of oxygen.

Defendant testified on his own behalf. Defendant testified that he was born in Chicago. Defendant testified that he does not speak Spanish and cannot read or write English. Defendant dated the victim's mother and lived with her, but she left one day and never returned. He decided to take in the victim because she had nowhere to go. Defendant denied being the victim's lover and stated the unborn child was not his.

On July 9, 2000, defendant was sleeping and when he awoke, the victim was glassy-eyed, staring at static on the television. Defendant testified that he slapped her because she was pale and unresponsive to his questions. Defendant believed that slapping her would "brighten her up." However, the victim got "hyper" and head-butted defendant twice, he grabbed her, but she head-butted him again, knocking out his teeth, and hit him in the groin. Defendant testified that he got mad and then bit the victim. Defendant stated that his face was puffy from being head-butted, but noted that he did not tell Deana that his teeth had been knocked out, he did not recover the lost teeth, and he did not know where the teeth went.

Defendant testified that at this time, the police came to the door. Defendant stated that there was no yelling or screaming. When the police arrived, the victim was sitting on the couch and he told her she could open the door if she wanted. Defendant denied refusing to open the door for the police. After the police left, defendant went to his friend's house. However, his friend was not home, so he went back to the apartment. When he returned, the victim was in the

bedroom and would not get up. Defendant testified that the victim was wearing a T-shirt and shorts and that he did not try to change or dress her.

The trial court refused to give instructions for involuntary manslaughter or second degree murder by provocation. The trial court instructed the jury on second degree murder by unreasonable belief in self-defense. The jury found defendant guilty of first degree murder and intentional homicide of an unborn child. Defendant was sentenced to consecutive terms of 60 and 40 years' imprisonment, respectively, for these convictions. This appeal followed.

## II.  ANALYSIS

### A.  Jury Instructions

Defendant first argues that the jury instructions tendered by the trial court were defective. In particular, defendant argues that the trial court improperly declined his requests for instructions on involuntary manslaughter and second degree murder based on provocation. As the decision to allow a jury instruction is the province of the trial court, absent an abuse of discretion, refusal of a proposed jury instruction will not be reversed. *People v. Garcia*, 165 Ill. 2d 409, 432 (1995). Where some credible evidence exists to support an instruction for a lesser offense, it is an abuse of discretion to fail to give that instruction. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). However, whether a defendant has met the evidentiary minimum for a certain jury instruction is a matter of law and our review is *de novo*. *People v. Luckett*, 339 Ill. App. 3d 93, 99 (2003).

First degree murder requires proof that the defendant intended to kill or inflict great bodily harm upon the victim, or knew that his acts created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2004). If the defendant has taken the life of another, but done so due to a sudden and intense passion resulting from serious provocation, or the

defendant acted under an unreasonable belief he was acting in self-defense, he has committed second degree murder. 720 ILCS 5/9-2(a)(1) (West 2004). Involuntary manslaughter requires proof that, though a defendant did not intend to kill the victim, he recklessly acted in a way likely to cause death or great bodily harm to the victim. 720 ILCS 5/9-3(a) (West 2004).

The major factors in determining recklessness include the disparity in size and strength between a defendant and victim, the brutality and duration of a beating, the severity and number of injuries, and whether a defendant used bare fists or a weapon. *DiVincenzo*, 183 Ill. 2d at 251. Again, the facts and circumstances of the particular case determine if these factors are met and an involuntary manslaughter instruction is warranted. *DiVincenzo*, 183 Ill. 2d at 251. However, where the evidence clearly demonstrates that the crime was murder and there was no credible evidence upon which a jury could find the defendant guilty of manslaughter, no instruction on the lesser offense is to be given. *People v. Lockett*, 82 Ill. 2d 546, 551 (1980).

Serious provocation may arise from substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest and adultery with the offender's spouse. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). As argued by defendant, the only plausible ground to support an instruction for second degree murder on the basis of provocation in this case is due to a mutual quarrel between defendant and the victim. This requires more than mere words, but mutual combat so serious that it mitigates against a finding of first degree murder. *Garcia*, 165 Ill. 2d at 430. The ultimate decision if the alleged mutual combat was serious enough to rise to this level of provocation is typically a question for the jury. *Garcia*, 165 Ill. 2d at 430.

Defendant has mischaracterized the evidence in this case. Viewing the evidence as presented to the jury, we agree with the State that there was no support for defendant's requested

-9-

instructions. We find that the trial court did not abuse its discretion in refusing to tender to the jury instructions on involuntary manslaughter and second degree murder based on provocation.

Defendant contends that he did not intend to kill the victim, but attempted only to "brighten her up" out of what he thought might be a drug-induced haze by "smack[ing] her around." Defendant argues that his testimony at trial supported these instructions because he was involved in a back-and-forth fight with the victim. Defendant admits that he slapped the victim initially because he was angry that she was using drugs. Further, he argues that the mutual combat then ensued with the victim head-butting him three times, knocking his teeth out. Defendant argues that, only then, did he punch her. He also asserts that the victim subsequently hit him in the groin.

However, this was not defendant's testimony at trial. Defendant testified that he slapped the victim "[l]ike once, twice, three times" in the face. Defendant then punched her with a closed fist, he thought only one time, on the cheek. Defendant testified that, only at this point, the victim got up "hyper," he told her to slow down, but she head-butted him three times. Defendant concluded that he then became angry because he had lost some of his front teeth, he restrained her, and he bit her. At that point, defendant testified that the police arrived and the fighting ended.

Therefore, defendant's argument on appeal that he acted recklessly only in response to mutual combat falls completely flat based on a true reading of the record. Even ignoring the videotaped confession, defendant admitted at trial to knowingly slapping the victim repeatedly and punching her in the face with a closed fist before any retaliatory action was taken. Despite defendant's contention that Morgan's testimony that she heard a woman yelling "stop hitting me"

and hitting sounds corroborates his version of mutual combat, it also corroborates the State's version.

While defendant did not use a weapon and, as defendant argues, the record indicates that he was a small man easily outweighed by the victim, these facts do not support the involuntary manslaughter instruction. As stated in *DiVincenzo*, the recklessness determination is to be based on the facts and circumstances of each particular case. To argue that the size factor from *DiVincenzo* is at all relevant completely ignores the facts and circumstances of this case. Simply, the victim was a 14-year-old girl who was approximately 8 months pregnant, that, without provocation, was slapped and punched in the face repeatedly and brutally by defendant, a 31-year-old man. Defendant's slight build and the lack of a weapon do not tilt the balance in this case. The trial court's finding that there was no evidence of recklessness or of mutual combat so serious to support defendant's requested instructions was not an abuse of discretion.

### B. Prosecutorial Misconduct

We next consider defendant's claim that he was prejudiced by prosecutorial misconduct during the State's closing rebuttal argument. It is well settled that prosecutors enjoy wide latitude in closing arguments and that the scope of permissible argument rests within the sound discretion of the trial court. *People v. Griffin*, 368 Ill. App. 3d 369, 376 (2006). Any improper comments or remarks made by a prosecutor in closing arguments are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. *People v. Sutton*, 316 Ill. App. 3d 874, 893 (2000).

In reviewing allegations of prosecutorial misconduct, this court must consider the arguments of both the prosecutor and the defense in their entirety and place the allegations of

improper comments in context. *People v. Evans*, 209 Ill. 2d 194, 225-26 (2004). The prosecution has the right to comment on the evidence presented at trial and draw all reasonable inferences deducible therefrom. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). The prosecution may also respond to comments made by defense counsel. *People v. Abadia*, 328 Ill. App. 3d 669, 678-79 (2001). Regulation of remarks by counsel is best left to the trial court's discretion, which may cure such errors by giving proper jury instructions on the law, informing the jury that counsel's arguments are not evidence and to be disregarded if not supported by the evidence at trial, or by granting an objection and admonishing the jury to disregard comments. *Simms*, 192 Ill. 2d at 396.

First, the State argues that defendant waived argument on this issue for failing to object to every comment argued as improper here on appeal, and therefore the issue was not preserved for review. *People v. Enoch*, 122 Ill. 2d 176 (1988). The State notes that defendant objected numerous times during closing rebuttal, but objected to only 6 of the 17 comments claimed improper here on appeal. Even if we agreed with this argument, under *Evans* we must consider the arguments of the parties in their entirety to consider them in context and determine if the preserved comments were unduly prejudicial. Certainly, six specific objections, in addition to numerous ancillary objections made during rebuttal, are sufficient to overcome the State's waiver argument.

Accordingly, we begin by summarizing the relevant portions of closing argument. Defense counsel highlighted that it is the State that must prove defendant's guilt beyond a reasonable doubt and that defendant had no such burden. Defense counsel argued that the State had presented a case of innuendo and that the evidence did not prove defendant's guilt beyond a

reasonable doubt. Counsel noted that there was no proof that the victim was defendant's girlfriend, but that she was his ex-girlfriend's abandoned daughter that he was caring for. Counsel continued to argue that the truth was in what defendant said from the stand, not from his statement to the police. Counsel argued that defendant was never asked his motive during the statement.

After a brief introduction, Assistant State's Attorney Fabio Valentini began his second paragraph of rebuttal argument by claiming that defense counsel had attempted to create diversions. Defendant asserts that additional similar comments compounded the State's error. The questioned comments, and associated objection, if any, are as follows:

"MR. VALENTINI [Assistant State's Attorney]: He's the defendant in this case and from the first minute of their opening statement on Tuesday, throughout the trial, and right up until two minutes ago you have all been under siege, besieged with one diversionary tactic after another, trying to cast blame and point fingers at anybody and everything, anything and everything aside from him.

* * *

Every time they stand here and point fingers at us, we're not on trial here.

MS. McBETH (Defense Counsel): Objection, your Honor.

THE COURT: Overruled. It's argument. The jurors can accept anything they wish to accept or reject. Overruled.

MR. VALENTINI: That's an attempt to try to create side issues. Diversionary tactics.

* * *

-13-

That was a diversionary tactic, has nothing to do with this case. There is no evidence anybody suffered from that, gestational diabetes or any diabetes.

* * *

Our evidence in this case is clear and overwhelming. And I would ask you to remember the defendant's defense in this case, only a three day trial, his defense in this case has changed every day.

MS. PLACEK (Defense Counsel): Mis-statement, Judge.

THE COURT: Let's hear the rest of the argument, overruled.

MR. VALENTINI: In opening statement, it was something to the effect of this might be an involuntary manslaughter.

MS. PLACEK: Objection.

THE COURT: Objection sustained. Let's move on.

MS. PLACEK: As[k] it be stricken, Judge.

THE COURT: The jurors will strike that comment, let's proceed.

MR. VALENTINI: The defendant's testimony was he only slapped her three times and apparently didn't even kill her. And now their argument today is something else."

The State also argued that it proved defendant's guilt beyond a reasonable doubt. As defendant argues, Valentini argued that defendant was not a credible witness and repeatedly called him a liar and opined that his testimony should be disregarded as it would be "ludicrous" or "insane" to believe his story. Valentini also argued that the State's witnesses were telling the truth. Valentini offered that: Morgan, a convicted felon, had every reason not to call 911 on the

night of the incident, but still did, and had every reason to tell the truth at trial; Officer Hackett would not lie about leaving the scene at the initial call because he would not lie to make himself look "stupid"; and Longhitano would not risk his law license to lie about defendant's statement.

Defendant argues that during rebuttal closing arguments Valentini crossed the line so often that defense counsel objected 24 times during rebuttal argument and jury instructions could not cure the prejudicial error to his case. Defendant notes that Valentini told the jury that defendant was a liar 14 times during rebuttal. Defendant points to Valentini's claim that defendant's testimony was an insult to the jury's intelligence and that they would have to be lunatics to believe him over the State's witnesses, who all told the truth. Defendant claims that this constitutes serious error as a prosecutor may not argue that in order to acquit a defendant the jury would have to believe the State's witnesses were lying. *People v. Baugh*, 358 Ill. App. 3d 718, 742 (2005). Defendant argues that it is important to understand that the State argued that the jury could not base a verdict on defendant's false testimony and, therefore it only had one possible verdict. *People v. Coleman*, 158 Ill. 2d 319, 346 (1994).

In conjunction with this argument, defendant asserts that the State improperly argued the veracity of its witnesses. Defendant claims that the argument that Longhitano was truthful because there was no reason that he would take a chance to lose his license was improper based on the prohibition against arguing that police officers would not risk their jobs, reputations, and pensions by lying on the stand. See *People v. Fields*, 258 Ill. App. 3d 912, 921 (1994). Defendant also claims that Valentini improperly vouched for the testimony of Officer Hackett because it made him look "stupid." He claims that this violates the prohibition on arguing that a sworn police officer is less likely to lie than a layperson. *People v. Ford*, 113 Ill. App. 3d 659,

662 (1983).

Defendant also argues that Valentini improperly repeatedly claimed that defense counsel had used "diversionary tactics," changed its defense every day, and demonized the victim to try and avoid conviction. Defendant argues that his case is like that in *People v. Weathers*, 62 Ill. 2d 114 (1975). In *Weathers*, the prosecutor made several comments and allegations during closing argument that the defendant, and defense counsel, were lying and attempting to create a reasonable doubt by confusion, indecision, and misrepresentation. *Weathers*, 62 Ill. 2d at 120. Although there was considerable evidence against the defendant, our supreme court found that the comments were not inadvertent errors and were severely prejudicial, warranting reversal and remand for a new trial. *Weathers*, 62 Ill. 2d at 120-21.

Defendant argues that this court's decision in *Abadia* is particularly instructive, noting that Valentini was admonished in *Abadia* for similar improper comments during closing arguments. During closing arguments in that case, Valentini stated that the jury should wonder why the defense presented distractions, distortions, and misstatements and changed its theory of defense frequently during the three day trial. *Abadia*, 328 Ill. App. 3d at 682. Valentini also argued that these actions by the defense were an insult to the jury's intelligence. This court found Valentini's argument strayed so far from proper argument that it was reversible error. *Abadia*, 328 Ill. App. 3d at 684. Defendant argues that these same repeated arguments by the State in this case also require reversal.

The State argues that the evidence presented in this case was not closely balanced and, even if there were prosecutorial misconduct, it was not such that defendant was prejudiced to require a new trial. It asserts that defendant's closing argument and testimony at trial invited the

State to argue against defendant's credibility and his changing defense. The State concedes that comment on the veracity of opposing counsel is improper. However, it argues that comments on a theory, or theories, of defense are proper when supported by the evidence of record, citing *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000), *People v. Hudson*, 157 Ill. 2d 401, 442-43 (1993), and *People v. Seuffer*, 144 Ill. 2d 482, 511-12 (1991).

In *Seuffer*, the prosecutor mentioned nine times that the defendant was utilizing the "confusion defense" by presenting several theories of defense. Based on the entire record and the defense's claims of insanity and several theories of defense, our supreme court found that the prosecutor's argument did not exceed the bounds of proper argument. *Seuffer*, 144 Ill. 2d at 512-13. The State argues that the record in this case demonstrates that defendant presented claims that the State failed to explain its burden of proof, the State presented a case of innuendo, the medical examiner failed to test for all drugs or complete a DNA test on the fetus, and that Longhitano did not know anything about the case when he interviewed defendant. The State argues that it simply responded to all these claims and did not accuse defense counsel of fabrication, trickery, deception, or suborning perjury. See *Kirchner*, 194 Ill. 2d at 549-50. Furthermore, the State argues that any prejudice regarding comment on the changing defense was removed when the trial court sustained defendant's objection to the prosecutor's mention of an involuntary manslaughter defense.

The State argues that the fact that Valentini was taken to task by the *Abadia* court for prosecutorial misconduct is irrelevant. Furthermore, it argues that *Abadia* is distinguishable because it involved allegations of defense counsel fabricating a defense, which the State readily concedes is improper. With respect to challenging defendant's credibility, the State notes that this

is proper when evidence is established to support such a challenge. *Kirchner*, 194 Ill. 2d at 549. The State argues that it presented ample corroborating evidence to prove defendant's lack of credibility and supported attacking his testimony at trial.

First, we agree that the temptation for defendant to note that trial counsel was the same for this trial as in *Abadia* and that fact demonstrates a pattern of behavior that "no doubt" proves his comments were intentionally prejudicial should have been resisted. However, we also agree that Valentini should have resisted the temptation to utilize such extensive rhetoric in closing argument. That said, while Valentini came dangerously close to tainting the trial, his arguments were not such error that reversal is required.

As noted above, during closing rebuttal argument, the State is allowed to respond to the defendant's arguments based on the evidence at trial. A prosecutor may suggest a defendant is a liar if supported by the evidence or a reasonable inference from the evidence. *People v. Defyn*, 222 Ill. App. 3d 504, 512 (1991). While Valentini's rhetorical flourishes were unnecessary, the fact remains that he also supported these arguments specifically citing to the evidence, in particular the fact that defendant's story at trial was vastly different from his prior version of the incident. In addition, Valentini highlighted inconsistencies with other witnesses and some of the testimony that was incredible. As the trial court responded to most of defense counsel's objections, this was argument by counsel, and the jury, which had heard all evidence at trial, was free to disregard or accept that evidence and was properly instructed of that fact.

Furthermore, the key distinction on this issue as highlighted by *Coleman* is that it is a serious error to argue the jury, in order to acquit a defendant, must find the State's witnesses were lying, while it is less serious error to argue that to believe defendant, it must find the State's

witnesses were lying. *Coleman*, 158 Ill. 2d at 346. Valentini argued simply that defendant was lying and could not support his defense. With respect to the State's witnesses, Valentini claimed they were truthful and had every reason to be believed.

Valentini's bolstering of Hackett's testimony was not improper under *Ford* and that line of cases. He did not argue that Hackett would not lie because he was a sworn police officer, but simply argued that it did not stand to reason that Hackett would make up a lie that made him look "stupid." Although it was error to argue that Longhitano would not lie because he was sworn to represent the people and there was no reason he would put his law license in jeopardy, it was not such an egregious error to deny defendant a fair trial.

Likewise, we do not find the arguments that defense counsel undertook diversionary tactics to be prejudicial. First, we do not find that Valentini attacked defense counsel but, rather, the theories of defense. This is an important distinction that typically removes a prosecutor's comments from consideration as prejudicial. See *Abadia*, 328 Ill. App. 3d at 683; *Baugh*, 358 Ill. App. 3d at 743. In *Abadia* and *Baugh*, this court highlighted that to be prejudicial, such commentary must be pointed at defense counsel and there must be an absence of evidence that counsel acted unethically. Here, Valentini pointed to how defendant attempted to present different theories as to how the victim died, and did not accuse the defense of unethical behavior. Accordingly, despite such strong or theatrical language, Valentini walked a dangerously close line, but did not engage in misconduct to deny defendant a fair trial.

## C. Evidentiary Issue

Next, defendant argues that he was prejudiced by the introduction of evidence of defendant's relationship with the victim. Defendant asserts that the State assured that it would

not seek to introduce evidence of other crimes committed by defendant and that it's subsequent questioning of witnesses regarding defendant's relationship with the victim violated that assurance and prejudiced defendant. The admission of evidence at trial is within the sound discretion of the trial court and may not be overturned on appeal absent an abuse of that discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

Evidence of other crimes or bad acts for which the defendant is not on trial is inadmissible if it is offered merely to demonstrate a propensity to commit crime. *People v. Shinohara*, 375 Ill. App. 3d 85, 114 (2007); *Illgen*, 145 Ill. 2d at 364. Such evidence is admissible if it is relevant to intent, identification, motive, absence of mistake, or modus operandi. *Shinohara*, 375 Ill. App. 3d at 114. However, if the probative value of such evidence is so outweighed by the danger of undue prejudice or jury confusion, it should be excluded. *People v. Nunley*, 271 Ill. App. 3d 427, 431 (1995).

Defendant argues that the State's questioning of witnesses regarding his relationship with the victim was so prejudicial to outweigh any possible probative value. Defendant cites to several cases that stand for the proposition that a prosecutor may not present evidence to simply demonstrate a defendant's nefarious relations with women. Defendant contends that *People v. McCorkle*, 239 Ill. App. 3d 1014 (1993), where the Third District of this court reversed a conviction for aggravated criminal sexual abuse, is instructive. In *McCorkle*, the prosecutor elicited testimony that the defendant began dating his ex-wife when she was 16 years old and he was 36 years old and also referenced those facts in closing argument. The prosecutor used this information to answer the rhetorical question during closing of why the defendant would go after " 'jail bait.' " *McCorkle*, 239 Ill. App. 3d at 1015. The court reversed the conviction, finding that

the evidence was close and the comment was elicited simply to imply the defendant's propensity to commit the crime, which the prosecutor then exacerbated in closing. *McCorkle*, 239 Ill. App. 3d at 1016.

Defendant notes that during closing rebuttal argument in this case, the State commented on the alleged sexual relationship with the victim, stating that defendant denied such a relationship because he was afraid the jury would find he was a bad person. Defendant argues that the multiple questions about his relationship with the victim and the State's closing comment prejudiced him. We disagree.

As the State argues, unlike in *McCorkle*, the evidence of the relationship between defendant and the victim was relevant and probative. The relationship between the parties explains why they were living together and, more importantly, helps explain why defendant might have acted so emotionally if he thought the victim was using drugs while pregnant. The State's theory, accepted by the jury, was that this was a domestic scenario that escalated. Essential to the State's theory was establishing the relationship of the parties.

In addition, as defendant admitted that the victim was his girlfriend during his videotaped statement, this evidence also was proper to demonstrate his credibility and corroborate his earlier statement. The State did not dwell on whether the relationship itself was wrong or criminal. The State did not improperly utilize any testimony as an improper basis to support a propensity to commit the crime as in *McCorkle*. Accordingly, the trial court did not abuse its discretion and defendant was not prejudiced by the admission of this evidence.

### D. Excessive Sentence

Finally, defendant argues that the trial court abused its discretion in sentencing him to

concurrent terms totaling 100 years. The standard of review of sentencing issues is whether the trial court abused its discretion in handing down a sentence. *People v. Shaw*, 278 Ill. App. 3d 939, 953 (1996). In review, we are to grant great deference to the judgment of the sentencing court as it is in the best position to "analyze the acts constituting the crime and a defendant's credibility, demeanor, general moral character, mentality, social environments, habits, age, and potential for rehabilitation." *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004). It is within the trial court's discretion to determine what significance is given to each aggravating and mitigating factor. *People v. Saldivar*, 113 Ill. 2d 256, 270-71 (1986). However, the most important factor to consider is the seriousness of the offense. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). Unless the sentence is grossly disproportionate to the nature of the offense committed, the sentence should be affirmed. *People v. Phillips*, 265 Ill. App. 3d 438, 449 (1994).

Defendant notes that this discretion in sentencing is not without limit. Defendant argues that the trial court ignored several mitigating factors and only relied, improperly, on its own opinion of the crime in handing down the sentence. *People v. Henry*, 254 Ill. App. 3d 899, 905 (1993). In *Henry*, the defendant was convicted of armed robbery and aggravated battery for snatching a woman's purse and cutting her husband with a knife in the process. *Henry*, 254 Ill. App. 3d at 900-01. The trial court imposed a sentence of 25 years' imprisonment for armed robbery and a consecutive 5 years' imprisonment for aggravated battery. In doing so, the trial court stated that it took into account aggravating and mitigating factors but stated that "[t]his is really a disgusting crime. And that's why you are given this amount of time." *Henry*, 254 Ill. App. 3d at 904. This court remanded the cause for resentencing because the trial court's statement indicated it had relied upon its own opinion of the crime. *Henry*, 254 Ill. App. 3d at

905.

In this case, after the parties presented their sentencing arguments, defendant was given the opportunity to speak. Defendant complained of never having a visit from his attorney while in prison and asserting that the State presented no evidence of the victim "being choked or nothing." Defendant continued by saying, "So, all I can come back is on appeal or something." When asked if he wanted to say anything else, defendant responded that he was finished. The trial court stated "Okay" and defendant responded, "Thank you. I'm sorry about what happened to Son[y]a Garcia."

When handing down the sentence, the trial court said "But this crime itself, there is no mitigation to the crime whatsoever, the defendant committing a crime like this." The trial court continued that defendant should never get out of prison. Defendant argues that this indicates that the trial court based its decision on the opinion of the crime and not the proper factors. Therefore, defendant concludes that *Henry* requires the matter be remanded for resentencing or this court must modify the sentence imposed.

The State argues that the trial court imposed sentences within the statutory limits of 20 to 60 years for each crime. See 730 ILCS 5/5-8-1(a)(1)(a) (West 2004). As such, we must begin with the presumption that the sentence was properly determined. *Ramos*, 353 Ill. App. 3d at 137. The State also notes that we must follow the presumption that the trial court has considered all mitigation evidence presented. *People v. Morgan*, 306 Ill. App. 3d 616, 633 (1999). The State concludes that, because of the severity of the crime, the most important factor in determining a sentence, the trial court properly determined defendant's sentence.

We agree that defendant's sentence must be upheld. As noted above, the trial court is in

the best position to measure a defendant's credibility, demeanor, general moral character, mentality, and potential for rehabilitation. This court may not take the trial court's findings lightly and cherry-pick from the record to support a reduction of sentence. Standing alone, the trial court's comments that there could be no mitigation in this case and that it did not see anything mitigating about defendant might be grounds for remand. In this case, however, remand or modification is not warranted.

Defendant highlights that the trial court specifically only noted his lack of violent criminal history as a mitigating factor. The trial court did not mention that defendant was mentally deficient or his ability to maintain employment in discussing the sentence. However, there is ample record to support application of the presumption that the trial court has considered all factors in mitigation and aggravation. *People v. Morgan*, 306 Ill. App. 3d 616, 633 (1999). The trial court clearly considered both aggravating and mitigating factors and found the seriousness of the crime outweighed them.

The trial court stated that it did not consider evidence of a past physical altercation defendant had with his sister-in-law and also that his lack of criminal history did not serve to mitigate his sentence. The trial court highlighted the obvious extent of defendant's lack of remorse. Specifically, the trial court noted that defendant committed a reprehensible crime and then fled to Texas, where he remained in hiding for four years. Defendant stood trial and the trial court was able to weigh defendant's credibility, demeanor and general moral character. Defendant proved his lack of remorse by only mentioning the victim as an afterthought during the sentencing hearing.

Unlike in *Henry*, where there was no serious injury and the stolen money was recovered,

here a girl and an eight-month-old fetus perished. The heinousness of this crime cannot be ignored. There is no argument against the trial court's conclusion that "[w]hen you talk about an unpleasant, horrible crime, the murder of a 14-year-old pregnant girl is right up near the top of the list." Indeed, the evidence at trial accepted by the jury was that defendant progressed from slapping to punching to choking the victim in an increasingly violent fashion. Defendant's lack of remorse and the utmost seriousness of this crime support the sentence imposed by the trial court.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

NEVILLE, P.J., and O'BRIEN, J., concur.

No. 1-06-0682

| Please Use Following Form: | REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT (Front Sheet to be Attached to Each Case) |
|---|---|
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS, <br><br> Plaintiff-Appellee, <br><br> v. <br><br> RAUL TIJERINA, <br><br> Defendant-Appellant. |
| Docket No. <br><br> COURT <br><br> Opinion Filed | No. 1-06-0682 <br><br> Appellate Court of Illinois <br> First District, FOURTH Division <br><br> March 31, 2007 <br> (Give month, day and year) |
| JUSTICES | JUSTICE MURPHY delivered the opinion of the court: <br><br> Neville, P.J. and O'Brienl, J., <br><br> concur [s] |
| APPEAL from the Circuit Ct. of Cook Cty; <br><br> The Hon. _____, <br> Judge Presiding. | dissent[s] <br><br> Lower Court and Trial Judge(s) in form indicated in the margin: <br><br> The Honorable Stanley J. Sacksl , Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago. <br><br> For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. <br><br> Attorneys for Appellant: Michael J. Pelletier, Deputy Defender and Erin G. McFeron, Asst. Appellate Defender <br> 203 N. La Salle Street, 24th Floor, Chicago, IL 60601 <br><br> Phone: (312) 814-5472 <br><br> Attorneys for Appellee: Richard A. Devine, Cook County State's Attorney <br> James E. Fitzgerald, Ashley Romito, Peter Fischer, Sari |

No. 1-06-0682

London, Assistant State's Attorneys, Of Counsel
Room 309, Richard J. Daley Center, Chicago, IL   60602
(No phone number listed)

**(USE REVERSE SIDE IF NEEDED)**

-27-