2023 IL App (1st) 210902-U
No. 1-21-0902

FIRST DIVISION
April 24, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 3371 |
| | ) | |
| DENELL LOGAN, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Michelle McDowell Pitman, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held:* Defendant's five-year sentence affirmed where it fell within the statutory sentencing range and was not excessive.

¶ 2   Following a bench trial, defendant Denell Logan was convicted of multiple counts of unlawful use or possession of a weapon, one count of unlawful use of a weapon, and one count of reckless discharge of a firearm. He was sentenced to concurrent sentences of five years' imprisonment. On appeal, defendant challenges the sentence imposed, arguing that the trial court abused its discretion

and sentenced defendant to an excessive term of imprisonment. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4     Defendant was charged by indictment with six counts of unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a)); one count of unlawful use of a weapon (a shotgun less than 26 inches in length) (720 ILCS 5/24-1(a)(7)(ii)); and two counts of reckless discharge of a firearm (720 ILCS 5/24-1.5(a)). During a pre-trial status hearing, defense counsel sought a plea offer from the State, the State extended an offer, and on the next court date, defense counsel informed that trial court that defendant did not accept the State's offer.

¶ 5     On the day that the case was set for trial, the trial court inquired as to the status of any prior plea negotiations between the parties. The trial court passed the case to give the parties time to continue discussions about a possible plea agreement. Afterwards, defense counsel asked the trial court to conduct a Rule 402 hearing. The trial court learned that the State had tendered an offer "over the minimum" and defense counsel sought a statutory minimum sentence. The trial court explained, "…I'll give an offer in a 402, but that offer is going to be for today or proceed to trial. The witnesses are here, we'll proceed to trial." The trial court provided admonishments regarding this participation in the Rule 402 conference, including that he was "free to accept or reject my sentencing recommendation. You can certainly persist in your plea of not guilty of you wish and take the case to trial or accept my sentence and plead guilty…" The trial court did not hold the Rule 402 conference on the record.

¶ 6     The case was recalled, and the trial court stated that it "made the recommendation of the minimum penitentiary sentence available." Defense counsel stated that defendant wanted to

proceed to a bench trial. The trial court stated, "Offer is revoked at this point[,] and defendant responded, "Yes, ma'am."

¶ 7        Valerie Walker (Valarie), defendant's wife, testified that on February 8, 2018, she lived in a two-bedroom, first-floor apartment in a three-story apartment building in Calumet City, Illinois. She shared the apartment with her son, his girlfriend, and their three children. Defendant lived with other family members but "would come over often enough" because he worked as the "maintenance man" for the apartment building. Shortly after 6:00 p.m. on February 8th, she left her apartment to go to a grocery store across the street because she "didn't want to talk with [defendant]." The store owner and Denise Mason (Denise) were also inside the store. Valerie knew that defendant was looking for her. She asked the store owner and Denise to use their phones, but, ultimately, did not make any phone calls. Defendant came into the store while she was still there. She left the store with Denise and went to Denise's apartment, located across the hallway from Valarie's apartment.

¶ 8        While Valerie and Denise were in the dining room of Denise's apartment, Valerie heard Denise call the police. She also heard someone knocking on the door to her own apartment door. She thought it might be her daughter. She did not recall hearing anyone knocking on the door to Denise's apartment, but she did recall hearing defendant calling her name. Valerie left Denise's apartment and went to her own apartment to check on her grandchildren. She found her grandchildren "in the room praying." Then, she heard the police knocking on Denise's apartment.

¶ 9        She did not recall if the police searched her apartment, and she did not see the police take a gun from her apartment, but "they said they did." She was "too busy trying to make sure my grand kids was [sic] okay." She also did not recall telling an officer that the defendant had been inside her apartment, and she left after defendant threatened to kill her. She did recall that when she was

inside Denise's apartment, she "heard something loud outside[,]" but she could not tell if it was a gunshot because she was too upset. She heard the officer on the telephone says that "it sounded like a gunshot…" The police came to her apartment the next day and asked her if she knew that there was a gun inside her apartment. She denied that she told the police that she knew defendant had a firearm or that she did not want firearms in her apartment because she lived there with her grandchildren. On cross-examination, she testified that she did not see defendant in possession of a gun inside the store or at any point that day, or discharging a firearm outside a window.

¶ 10    Denise Mason testified that on February 8, 2018, she knew Valerie and defendant for approximately five years and lived across the hallway from them. On that date, shortly after 6:00 p.m., she went to the "mini mart" across the street. She saw Valerie, who asked her to use her phone. She noticed that Valerie "looked a little distraught about something" and was not wearing shoes or a coat. She saw that Valerie had used her phone, and then she defendant come into the store. She heard defendant tell Valerie to "come back home across the street." He sounded angry. Defendant said, "okay, you not coming okay…" and left the store. After defendant exited the store, Denise and Valerie walked across the street to Denise's apartment. Valerie told her that she did not want to go back to her own apartment because "she had been arguing."

¶ 11    Inside Denise's apartment, Valerie asked Denise to call the police because she was too upset to make a call. While Denise was on the phone with the police, defendant "banged" on the door to Denise's apartment two or three times. Defendant told Valerie to come out of the apartment, but Valerie would not leave. Defendant stopped banging, and she could hear him yelling from the front of the apartment building. He was trying to convince Valerie to come outside. During this time, Denise remained on the phone speaking with the police dispatcher.

¶ 12    At that point, Denise heard a gunshot from the front of the building, the same location where she had just seen defendant. Both Denise and Valerie hid in the bathroom and waited for the police to arrive. She could not hear if anything happened outside after she went into the bathroom to hide. She heard someone knocking on her door again after she heard the two gunshots.

¶ 13    When the police arrived, both walked outside. Denise spoke with a police officer and told the officer that she had been at the store across the street. She ran into Valerie, and defendant came into the store, yelling for Valerie to come home. She told the officer that defendant threatened to kill Valerie when he was "banging" on her door, but she denied that she told the officer that defendant also threatened to kill her. When Denise went back into her own apartment, she saw a "couple of dents" in her door. During Denise's testimony, the State played the audiotape of her 911 call in which she said that she heard two shots outside her home and asked the police to hurry. Defendant was outside at the time that she heard the two gunshots. On the audiotape, she also told the police that defendant had a gun, but she testified that she did not see defendant with a gun or discharging a gun.

¶ 14    Lakeisha Walker (Lakeisha) testified that on February 8, 2018, she was living in Calumet City, Illinois, with her mother, Valerie Walker, and defendant, along with other family members. In the early evening, she and her friend, Roy Ray (Roy), picked her up at her home in a car, went to a store, and then she came back home. When Roy dropped her off, she saw defendant outside, near the front gate to the apartment building. He was walking towards the front entrance to the apartment building. She did not see defendant holding anything. She heard three gunshots, but she did not see anyone fire a gun. When she heard the gunshots, defendant was "walking in the gate." She immediately looked for her mom to see if she was okay. She then ran into the building to look for her mother. Defendant was right behind her as she opened to door to the apartment building

and entered the building at that time. She came back outside and hid behind a nearby garbage can. She called the police on her cell phone.

¶ 15    When the police arrived, she recalled talking to them, but she did not recall what she specifically told them. She did not recall telling the police that she had seen defendant with a brown rifle in his hands, or that she had seen him shoot at Roy. She recalled telling the police that she heard gunshots and that she saw Roy leave the scene. Later that evening, defendant was arrested. She did not recall seeing one of the officers being handed a brown gun, and she denied previously seeing defendant with that gun.

¶ 16    Roy Ray testified that he was friends with Lakeisha and picked her up from her home around 6:00 p.m. on February 8, 2018. At that time, he was unfamiliar with Lakeisha's family, but he had seen defendant when he had previously picked her up from her home. He drove the car, and they went to some stores before he dropped her back at her home at approximately 6:30 p.m. He saw Lakeisha, after she exited his car, speaking with a person that he believed was defendant, based upon his height and weight, while they were in the doorway to the apartment building. The door appeared to be open. When Lakeisha walked inside, he pulled away. As he pulled away, he heard a noise that "sounded like a tire pop or some kind of noise" coming from behind him. He looked back and saw defendant standing in the doorway. He saw defendant holding something in both hands, but he could not tell what it was because it was dark. He quickly drove away from the scene because he got nervous after he saw defendant standing in the middle of the doorway. He explained that he thought he was getting shot at because he "turned around and seen the defendant I thought I believed to be somebody shooting at me." He described the object that defendant was holding as "black and it was long." He pulled into the intersection without looking for other traffic because

he believed that defendant was shooting at him. He immediately called Lakeisha and asked her what had happened and to make sure that she was okay.

¶ 17       Calumet City Police Officer Bradley Begeske testified that, in response to a radio call, he and other officers formed a perimeter around the apartment building. He spoke with Lakeisha near the front entrance to apartment building. At that time, he looked through the glass portions of the front door on the first floor and saw defendant standing inside the apartment building. He then saw that defendant walked upstairs to the second floor and the third floor while looking through the exterior windows along the stairwell. As defendant opened up a door on the third floor, Officer Begeske ordered him to "show his hands[.]" Defendant came back down to the first floor and exited the front entrance. Lakeisha, who had remained by the officer during this time, then identified this person as her stepfather. The officer noticed that defendant had a strong odor of an alcoholic beverage, his speech was slurred, and his balance was unsteady. He placed defendant under arrest and put him in his squad car.

¶ 18       While Officer Begeske was still at the scene, he spoke with Lakeisha, who told him that she had been outside with her boyfriend Roy, who was about to leave in his car. She saw defendant exit the apartment building holding a brown rifle, and she saw him fire a shot at Roy, who then left the scene. Officer Begeske also spoke with Valerie Walker, and both Valerie and Lakeisha allowed officers to enter their apartment to search it. Inside the apartment, Officer Wojcik handed him a brown wooden sawed-off shotgun. He noticed that the shotgun had been disassembled, meaning the barrel had been separated from the grip. Lakeisha identified it as the gun that defendant had in his possession.

¶ 19       Calumet City Police Officer Gary Wojcik testified that he was working as a patrol officer on the date of this incident and went into the apartment previously identified as belonging to Valerie.

Inside the main bedroom, he lifted the corner of the mattress and saw a double-barrel shotgun lying there in two pieces near the edge of the mattress. He recovered it and handed it to Officer Begeske when they were outside the apartment building.

¶ 20        Officer Begeske also spoke with Denise Mason at the scene and learned that she lived in the apartment directly across the hallway from Valerie and Lakeisha. She told him that defendant had threatened to kill her while at the corner store. He also observed "three separate strikes" with indentations and discoloration on the exterior portion her apartment door. The officer subsequently learned that another officer had recovered the foregrip of the sawed-off shotgun outside the apartment building laying on the ground outside the front entrance where Lakeisha had told him that defendant had fired the weapon. At the police station, Officers Begeske and Banksi reassembled the weapon and measured the barrel as 12 inches in length and found one spent shell casing inside the barrel.

¶ 21        Calumet City Sergeant Keith Kwiatkowski testified that he was working as a detective on this case, and he and Captain Erickson interviewed defendant in the lockup area of the police station on February 9, 2018, at 12:50 p.m. This interview was audiotaped and videotaped. The interview was delayed because defendant was intoxicated when he was first brought into the station. As they entered the interview room, defendant "blurted out that he fired a gun in the air" before the officers had the opportunity to inform him of his *Miranda* rights. After he was given and waived these rights, defendant stated that he was arguing with his wife, and she went to the "quickie mart" wearing no shoes or coat. He went to the store to see what she was doing. He came back and knocked on the neighbor's door with a baseball bat, looking for his wife. Then, he was outside with his stepdaughter, Lakeisha, and he had a double barrel sawed-off shotgun in his hand, cocked the gun and fired a shot. He stated that he did not mean to fire a shot in the air. He went back to

his apartment and put the gun underneath his bed. While defendant was at the police station, he consented to have a swab taken of his DNA, and Calumet City Sergeant Brian Smith took a buccal swab of defendant.

¶ 22    The State also presented testimony related to the testing for the presence of DNA. William Anselma, a forensic scientist with the Illinois State Police, received items in this case to examine them for the presence of DNA, including a shotgun grip and two pieces of a shotgun. He took swabs from various portions of these items, and he preserved these swabs as well as the buccal swab standards from defendant. Lyle Boicken, also a forensic scientist with the Illinois State Police, determined that a swab taken from the gun grip of the shotgun generated a mixture of at least four people, and he could not find a major DNA profile from the mixture. From the swab taken from the shotgun, he found a mixture of two people with one major DNA profile. He generated a DNA profile standard from defendant's buccal swab and compared it to the major profile from the shotgun. Defendant could not be excluded from the major DNA profile. He testified that one would expect to observe this profile in a general population only one time in 3.6 septillion individuals.

¶ 23    Jeffrey Parise, also a forensic scientist with the Illinois State Police, testified that he received parts of the shotgun, as well as two fired shells to analyze. He examined the spent shells from the test-fired shots with the two fired shells he received. He determined that the two fired shells he received were fired from the shotgun in this case. The State also introduced certified copies of defendant's convictions for possession of a stolen motor vehicle and burglary.

¶ 24    The trial court found defendant guilty of six counts of unlawful use of a weapon by a felon, one count of unlawful possession of a weapon, and one count of reckless discharge of a firearm

pertaining to endangering individuals in the vicinity of the apartment building. The trial court found him not guilty of reckless discharge of a firearm pertaining to Roy Ray.

¶ 25    At the sentencing hearing, the trial court stated that it had received the presentence investigation report and would consider it for purposes of evidence in aggravation and mitigation. Defense counsel tendered to the trial court "numerous letters of accolades from family and friends" in support of defendant. The trial court stated it had already reviewed this material. The trial court noted that defendant had been convicted of two Class 2, non-probationable felonies, as well as one Class 3 offense and one Class 4 offense. The State stated that, because the law had recently changed, defendant was no longer Class X based upon his background.  His prior felony convictions included a 1984 conviction for possession of a stolen motor vehicle, in which he was sentenced to 18 months' probation, terminated unsatisfactorily. In 1985, he was convicted of burglary, and sentenced to three years' imprisonment. In 1987, he was convicted of possession of a stolen motor vehicle and sentenced to four years' imprisonment. More recently, he also had been convicted of nine prior misdemeanor convictions. The State also pointed out that defendant's conviction was tied to his history of domestic battery when he had a prior misdemeanor conviction for domestic battery. The State asked the trial court to sentence defendant to a "meaningful amount of time in the Illinois Department of Corrections." Defense counsel argued that the majority of defendant's prior convictions were committed "a number of years ago," and that he "would be a good candidate for the minimum amount of time…" In allocution, defendant stated that he "ain't no perfect person, and I know you are fixing to judge me." He stated that he loved his family even though he "don't do right all of the time." He asked the trial court for mercy.

¶ 26    The trial court stated that it had considered the mitigating and aggravating evidence contained in the pre-sentence investigation report as well as the letters written by family and friends. The

trial court stated that defendant "should not be standing in front of a criminal judge facing a penitentiary sentence again, sir. That is based on your actions." The trial court noted that defendant was a grown man who should "know better, than to do this type of behavior." The trial court stated that "it's not easy for the Court of law a judge to sit here, see a wonderful family, see the thing in life, and have to sentence you, by law, to a penitentiary sentence." The trial court looked at the fact that defendant had a polite demeanor when he interacted with the police and in the courtroom. The trial court also found that the majority of defendant's convictions occurred several years ago. The trial court then sentenced defendant to five years' incarceration for the six counts of unlawful use or possession of a firearm by a felon and the one count of unlawful use of a weapon, to run concurrent to a three years' incarceration for reckless discharge of a firearm. Defense counsel made a motion to reconsider sentence and asked if the trial court would consider sentencing defendant four years' imprisonment. The trial court denied the motion to reconsider sentence.

¶ 27                                                              ANALYSIS

¶ 28        Defendant contends that the trial court abused its discretion in sentencing him to five years' imprisonment, two years above the statutory minimum, where his prior felony convictions were committed many years ago, the nature of the offense, and his rehabilitative potential. He also relies on the trial court's decision to offer to sentence him to the statutory minimum during a pre-trial Rule 402 conference and suggests that the increase in sentence was unjustified. The State, in turn, argues that the trial court exercised appropriate discretion in sentencing defendant to a term within the statutory sentencing range and that defendant does not provide any evidence to show that this sentence was manifestly erroneous, disproportionate to the several offenses that he committed, or greatly at variance with the spirit or purpose of the law.

¶ 29        A sentence that falls within the applicable statutory sentencing range is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 6. A reviewing court may reduce a sentence imposed by the trial court only when the record affirmatively shows that the trial court abused its discretion. *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 23; *People v. Perruquet*, 68 Ill.2d 149, 154 (1977). That power, however, should be exercised "cautiously and sparingly." *Alexander*, 239 Ill.2d at 212. A sentence is considered an abuse of discretion only where it is "greatly at variance with the spirit and purpose of law, manifestly disproportionate to the nature of the offense." *Id.* at 212. The spirit and purpose of the law are promoted when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant. *People v. Boclair*, 225 Ill.App.3d 331, 335 (1st Dist. 1992).

¶ 30        It is well-established that sentencing decisions are entitled to great weight and deference. *People v. Latona*, 184 Ill.2d 260, 272 (1998). The trial court, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the "cold" record. *People v. Alexander*, 239 Ill.2d 205, 213 (2010). The trial court's decision regarding the appropriate sentence is given great deference because they are in the best position to weigh the numerous factors that may influence the appropriateness of a sentence. *Id.* at 212 (2010) (citing *People v. Fern*, 189 Ill.2d 48, 53 (1999)). Relevant factors in determining an appropriate sentence include the nature of the crime, protection of the public, deterrence and punishment, and the defendant's rehabilitative prospects and youth. *People v. Bobo*, 375 Ill. App. 3d 966, 988 (1ˢᵗ Dist. 2007); *People v. Lamkey*, 240 Ill.App.3d 435, 441-42 (1ˢᵗ Dist. 1992). Additionally, a trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Streit*, 142 Ill.

2d 13, 18-19 (1991). The weight attributed to each factor in aggravation and mitigation in imposing a sentence depends on the particular circumstances in each case. *People v. D'Arezzo*, 229 Ill. App. 3d 428, 430 (2nd Dist. 1992). A reviewing court should not discount or alter the judgment of the trial court simply because it would weigh those factors differently. *Alexander*, 239 Ill.2d at 205; *People v. Stacey*, 193 Ill.2d 203, 209 (2000). The trial court is presumed to have considered all of the factors presented before it, absent evidence to the contrary. *People v. Jones,* 2019 IL App (1st) 170478, ¶ 54, *People v. Ramos*, 353 Ill.App.3d 133, 137 (1st Dist. 2004).

¶ 31     In determining an appropriate sentence, the trial court must consider both "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Hernandez*, 2016 IL 118672, ¶ 9. Indeed, "a defendant's potential for rehabilitation is but one factor for a sentencing court to consider, and it must be weighed against other countervailing factors, including the seriousness of the crime." *People v. Evans*, 373 Ill.App.3d 948, 968 (1st Dist. 2007). Without diminishing the significance of rehabilitative potential as a factor to be considered, we note that the sentencing court is not required to give this factor any greater weight than it affords the seriousness of the offense. *See People v. Gordon*, 2016 IL App (1st) 134004, ¶ 52. Unless the sentence given is grossly disproportionate to the nature of the offense committed, we should defer to the trial court's discretion and the sentence should be affirmed. *People v. Tijerina*, 381 Ill.App.3d 1024, 1039 (1st Dist. 2008).

¶ 32     Here, defendant was convicted of unlawful use of a weapon by a felon pursuant to section 24-1.1 of the Criminal Code, which constitutes a Class 3 felony with a sentencing range of two to 10 years' imprisonment. 720 ILCS 5/24-1.1(e). Because defendant had a prior conviction for burglary, an offense that constitutes a forcible felony, defendant was subject to Class 2 sentencing for a range of three to 14 years' imprisonment. *Id*. Because each of defendant's sentence falls

within its respective statutory range, his sentence is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 33    Furthermore, we are not persuaded that the trial court abused its discretion in imposing sentence. Defendant argues that no one was harmed by his actions, however, the evidence at trial established that defendant actions scared multiple people at the scene. Defendant ultimately hid the sawed-off shotgun inside the apartment at a time when three young children were inside that apartment and were found by Valerie, praying in the other bedroom. Valerie and Denise were fearful after hearing the gunshot and hid in Denise's bathroom. Defendant also threatened to kill Denise when he was banging on her apartment door. Upon hearing the gunshots, Lakeisha ran inside to try to find her mother and then ran back outside to hide behind a garbage can. Roy was so fearful, because he believed that defendant had shot at him, that he immediately drove away and pulled into the nearby intersection without checking for other traffic. Defendant admitted that he argued with his wife, she left their home without shoes and a coat, and then he later knocked on the neighbor's door with a baseball bat while his wife was inside. He also admitted that he fired the sawed-off double barrel shotgun in the air.

¶ 34    At sentencing, the trial court emphasized defendant's prior felony convictions, even recognizing that the felony convictions occurred when defendant was younger. "Prior convictions, or recidivism, [are] a traditional, if not the most traditional, basis for…increasing an offender's sentence." *People v. Fields*, 383 Ill.App.3d 920, 921 (1st Dist. 2008) (citations and quotations omitted). The trial court also heard that defendant had been previously employed, was remorseful of his actions, cared for some older family members, struggled with alcoholism, and had support from several family members and friends. Considering the seriousness of the offense, we cannot say the court abused its discretion in sentencing defendant to terms within the statutory guidelines.

See *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12 ("it is the seriousness of the crime – rather than the presence of mitigating factors – that is the most important factor in determining an appropriate sentence").

¶ 35    Defendant does not point to anything in the record to demonstrate that the trial court refused to consider the mitigating evidence, and, instead, focuses on how the trial court chose to weigh the mitigating evidence. However, a reviewing court may not reweigh the factors involved in a sentencing decision. *People v. Alexander*, 239 Ill.2d 205, 214 (2010). Additionally, the mitigation evidence presented does not persuade us to find that the trial court abused its discretion, being mindful of the fact that the trial judge is in the best position to consider all of the factors presented before the court and weigh them accordingly in determining the appropriate sentence.

¶ 36    Nonetheless, defendant asserts that because the trial court offered him the statutory minimum sentence of three years' imprisonment in exchange for a plea of guilty at a pretrial Rule 402 conference, his five-year sentence constituted a penalty for his decision to exercise his right to trial.

¶ 37    "[A] defendant cannot be punished by the imposition of a heavier sentence merely because he exercises his constitutional right to be tried before an impartial judge or jury." *People v. Carroll*, 260 Ill.App.3d 319, 348 (1992). A trial court may, however, grant 'dispositional concessions" in exchange for a plea of guilty. *People v. Moss*, 205 Ill.2d 139, 171 (2001). "[A] sentence greater than that offered before trial may be explained by the court's consideration of additional evidence regarding the circumstances of the crime admitted at trial." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 14. Thus, we do not presume that a sentence following a trial was imposed as punishment merely because it was greater than the one previously offered. See *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 19. Rather, there must be a clear showing in the record, which exists when a

trial court makes explicit remarks concerning the harsher sentence or where the actual sentence is "outrageously higher" than the one offered during plea negotiations. *Carroll*, 260 Ill.App.3d at 349. In making this determination, we consider the entire record, rather than focusing on a few words or statements of the trial court. *People v. Johnson*, 2018 IL App (1st) 153634, ¶ 18.

¶ 38    Here, we find that defendant's sentence was not punishment for exercising his right to trial. The record shows that the trial court did not make any negative comments concerning defendant's decision to proceed to trial. Instead, the trial court properly considered the evidence at trial as well as the aggravating and mitigating factors. Moreover, the Rule 402 conference was conducted off-the-record, so the record does not establish what counts were the subject of the court's offer following the Rule 402 conference. The trial court may not have been apprised of all the aggravating circumstances that were adduced at trial. See *Brown*, 2018 IL App (1st) 160924, ¶ 14. Defendant's sentence of five years' imprisonment is not significantly shorter than the three-year sentence considering that defendant was sentenced within the statutory guidelines – and considerably lower than the statutory maximum – we cannot say his sentence was "outrageously higher" than the trial court's pre-trial offer. See *Carroll*, 260 Ill.App.3d at 349. Therefore, defendant has not established that the trial court penalized him for proceeding to trial.

¶ 39    Based upon the facts presented to the trial court at the sentencing hearing, we agree with the State that the evidence does not show that the trial court abused its discretion in sentencing defendant to five years' imprisonment. Consequently, we affirm defendant's sentence.

¶ 40                               CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.