THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DE-MARCO YARBROUGH, Defendant-Appellant.

First District (2nd Division)   No. 1—93—0560

Opinion filed December 20, 1994.

Rita A. Fry, Public Defender, of Chicago (Denise R. Avant, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, Kalina Tully, and Steven C. Steinback, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

The issues presented in this case are whether the circuit court properly denied defendant's request for a jury instruction concerning second degree murder based upon sudden and intense passion, and whether judgments for both first degree murder and home invasion were proper. For the following reasons, we affirm.

A summary of the evidence heard by the jury, emphasizing the facts that defendant contends justify the second degree murder instruction, follows. In August 1989, defendant Demarco Yarbrough resided in a Richton Park apartment with Debra Turner, Richard Clerk, and Irma Jean McCastle. Defendant and Turner had been living together for six months. On Friday, August 18, 1989, defendant, the other occupants of the apartment, two of Turner's children (from a different relationship), and two of her other relatives were present at a dinner party at the Richton Park apartment. At some point during the night, Turner's relatives and Richard Clerk left the apartment and James Clerk, Richard's nephew, joined the party. The guests consumed alcohol, heroin, cocaine, and marijuana.

When the party ended early Saturday morning, defendant and Turner went to sleep in the bedroom they shared, McCastle went to sleep in her room, and James Clerk went to sleep on the couch in the living room. Defendant awoke Saturday afternoon and left the apartment to pick up his paycheck. He was away from the apartment for approximately 45 minutes to an hour. Turner testified that as she remained sleeping on the bed, while lying on her stomach and dressed in a nightshirt with no underwear, she was partially awakened by the feel of someone's fingers in her vagina. Half asleep, hung over from the night before, and still in a drugged state, she thought defendant was fondling her. When the person tried to adjust her legs to enter her, the movement popped Turner's hip and caused her pain. The pain awakened her, and she turned around to find that the man was James Clerk, not defendant. Turner screamed at him, asking what he was doing. Clerk responded that defendant was not present and since he and Turner had known each other for a long time he thought they could have intercourse. Turner shouted that he had better leave, and Clerk left the bedroom.

When defendant returned to the apartment, he drove James Clerk to a liquor store in Ford Heights and continued on to visit some relatives in Chicago. James Clerk's girlfriend, Sheila Harris,

testified that Clerk seemed upset and jumpy that evening, continually looking out the windows.

Defendant testified that he left Chicago around midnight on that Saturday night, returned to the Richton Park apartment, and went to sleep, without speaking to Turner. On Sunday afternoon defendant noticed Turner's distressed state and asked what was upsetting her. While crying hysterically, Turner replied defendant did not know what happened and asked why he would leave her in the house in the state that she was in. Defendant testified that Turner then said that Clerk had raped her. Turner testified that she was unsure whether she used the word "rape," "attack," or "molest," but it was a word in that category.

Defendant stated that he felt his stomach drop and, while crying, he immediately drove off to the 100 block of West Hickory Street in Chicago Heights where both his brother Dwayne Yarbrough and James Clerk resided. Defendant recklessly pulled his car into Dwayne Yarbrough's driveway at 130 Hickory Street. Defendant exited from the car, slapped a beer from the hands of his brother Demetrious Yarbrough and yelled, "That nigger raped Debra."

Defendant testified that he wanted to find out if it was true that Clerk had raped his girlfriend. Following defendant's request, Dwayne took him to Clerk's apartment, down the block, at 120 West Hickory Street. Defendant knocked on Clerk's second-floor apartment door, and Clerk eventually answered the door, allowing defendant into the apartment. Sheila Harris was also in the apartment at the time. Defendant did not want to speak in front of her, so he said, "I need to speak to you about something that's important." Clerk appeared shocked and agreed to meet defendant downstairs outside of the apartment. Defendant's signed statement to the police on September 27, 1990, detailing the events, failed to include any mention of defendant asking Clerk to meet him outside.

Defendant testified that he exited the apartment, went downstairs, waited for Clerk for a minute or two, and then went back to Dwayne's apartment. While in the apartment, defendant retrieved a large automatic rifle, measuring approximately three to four feet in length. Defendant grabbed the rifle for protection; he did not trust Clerk, viewing him as a threat. Defendant was emotional, confused, and hurt. He tried to place the rifle inside of his pants, but it did not fit.

Defendant testified that he exited Dwayne's apartment and headed back to Clerk's residence. Clerk was not in front of the apartment when defendant arrived. As defendant knocked on Clerk's door, he was hurt, his stomach felt funny, and he thought Clerk should

have been outside by then. When Clerk answered, he smiled at defendant. At that moment, defendant thought Clerk had raped Debra Turner. Clerk attempted to run, and defendant fired the gun several times in Clerk's direction. Defendant claimed that he pulled the automatic trigger only one time.

Sheila Harris testified that she opened the bedroom door when she heard a pop sound and observed Clerk lying on the ground, with both his hands up, "yelling for his life." James Rossi, an evidence technician for the Cook County sheriff's office, testified that a bullet recovered from the floor at the scene indicated that defendant fired that particular shot while standing over the deceased. Clerk had been shot five times.

Defendant then ran back down the street and through the gangway alongside Dwayne's apartment building, dropped the weapon, and continued into the forest preserve. Approximately one week later, defendant and Debra Turner fled to Minneapolis, where defendant was arrested over a year later, on September 19, 1990. The following day defendant gave a signed statement to police accounting the events surrounding James Clerk's death.

At trial, contending that he killed James Clerk under a state of sudden and intense passion after he learned that Clerk had sexually assaulted his girlfriend, defendant sought a jury instruction for second degree murder based upon sudden and intense passion. The trial court denied defendant's request. Defendant was convicted of first degree murder and home invasion, and he was sentenced to concurrent imprisonment terms of 40 years for murder and 30 years for home invasion.

## I

Defendant first contends that the trial court erred in refusing to give the jury an instruction on second degree murder.

A criminal defendant is entitled to have the jury consider any legally recognized defense theory which has some foundation in evidence, however tenuous. (*People v. March* (1981), 95 Ill. App. 3d 46, 54, 419 N.E.2d 1212, *reversed on different grounds People v. Chevalier* (1989), 131 Ill. 2d 66, 71, 544 N.E.2d 942.) Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—2 (now 720 ILCS 5/9—2 (West 1992))) provides that a crime is second degree murder when the State proves all the elements of first degree murder beyond a reasonable doubt, but a mitigating factor exists. (*People v. Burts* (1993), 256 Ill. App. 3d 972, 976, 628 N.E.2d 515, *vacated & remanded on different grounds* (1994), 155 Ill. 2d 567, 630 N.E.2d 845.) As applied to this case, an instruction concerning second degree murder is

appropriate if, at the time of the killing, the defendant was (1) acting under a sudden and intense passion, (2) which resulted from serious provocation. (*Burts*, 256 Ill. App. 3d at 976-77.) Although the Criminal Code does not define serious provocation, Illinois courts have traditionally recognized four different categories: substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. (*People v. Chevalier* (1989), 131 Ill. 2d 66, 71, 544 N.E.2d 942.) Generally, mere words are not considered serious provocation regardless of how aggravated, abusive, opprobrious or indecent the language. *People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270.

●2 Concerning the first relevant requirement for a second degree murder instruction, the State argues that defendant could not have been acting under sudden and intense passion because the period of time between his learning of the sexual assault and the shooting was sufficient to cool his passions. Defendant argues that he was emotional, hurt, and confused throughout the ordeal, citing his unsuccessful attempt to hide the rifle down his pants as evidence of his irrational state of mind at the time of the shooting.

The existence of a sufficient cooling-off period depends upon the magnitude of the provoking act and the degree to which passions have been aroused in the defendant. (*People v. Hudson* (1979), 71 Ill. App. 3d 504, 511, 390 N.E.2d 5.) "[N]o yardstick of time can be used by the court to measure a reasonable period of passion but it must vary as do the facts of every case." *People v. Harris* (1956), 8 Ill. 2d 431, 435, 134 N.E.2d 315.

In this case, defendant did not witness the act of sexual assault. After learning of the incident, defendant drove to Chicago Heights, walked to Clerk's residence, spoke to Clerk, returned to his brother's apartment (where he acquired a rifle), walked back to Clerk's residence, observed Clerk smile at him, and shot Clerk as he attempted to flee. We find that the length of time which passed and the defendant's actions within that period were such that defendant was not acting under sudden and intense passion when he killed Richard Clerk.

■ Furthermore, even if the facts here had satisfied the sudden and intense passion requirement, to justify a second degree murder instruction, the sexual assault of defendant's girlfriend had to be deemed a serious provocation. To do this, two distinct hurdles had to be overcome: (1) the act must fall within one of the four recognized categories of provocation; and (2) "mere words" are generally not an adequate provocation.

Regarding the first issue, defendant concedes that the first three

recognized categories of provocation listed in *Chevalier* are not applicable to this case. Considering that the legislature has imposed no limitations upon the categories, defendant argues that the sexual assault upon the woman with whom he had lived for many months constituted a sufficient provocation, one he equates to the adultery-with-spouse provocation. He therefore urges this court to expand the adultery defense to include marital-type relationships.

We note first that defendant's proposed expansion was rejected in *People v. McDonald* (1965), 63 Ill. App. 2d 475, 480, 212 N.E.2d 299. The supreme court addressed the issue in *People v. McCarthy* (1989), 132 Ill. 2d 331, 547 N.E.2d 459, explaining that the spousal limitation has been questioned in legal literature in instances of a "longstanding relationship comparable to that of husband and wife. [Citation.]" (*McCarthy*, 132 Ill. 2d at 341.) The court noted that some of the rationale supporting recognition of adultery with a spouse as sufficient provocation under the second degree murder statute would also be applicable in the absence of a marital relationship. The court further noted, though, that Illinois continues to differentiate between marital and nonmarital relationships by refusing to recognize the validity of common law marriages. (*McCarthy*, 132 Ill. 2d at 341.) Ultimately, however, the *McCarthy* court made no determinative statement because the relationship between the defendant and deceased in that case had ended before the killing, thus making the question moot. *McCarthy*, 132 Ill. 2d at 342.

Illinois courts have subsequently addressed the issue and have found either that the relationship had already terminated, as in *McCarthy* (see *People v. Elder* (1991), 219 Ill. App. 3d 223, 229, 579 N.E.2d 420), or that the statute's sudden passion requirement was not fulfilled. (See *Burts*, 256 Ill. App. 3d at 977.) To date, no Illinois court has extended the adultery category beyond a legal marriage to marital-type relationships.

In any event, the physical act involved in this case is criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—13 (now 720 ILCS 5/12—13 (West 1992))), not adultery (Ill. Rev. Stat. 1991, ch. 38, par. 11—7 (now 720 ILCS 5/11—7 (West 1992))). We believe that the public policy of this State dictates that the appropriate response to sexual assault is to seek redress through the criminal justice system. Adherence to that policy is especially mandated when, as here, defendant did not personally witness the sexual assault, a significant period of time passed between the act and his being told of it, and a significant time passed between his learning of the act and the shooting.

■ As for the "mere words" issue, we note that a report of adultery by a spouse, in itself, is not serious provocation. (*People v.*

*Chevalier* (1989), 131 Ill. 2d 66, 76, 544 N.E.2d 942.) "In Illinois, adultery with a spouse as provocation generally has been limited to those instances where the parties are discovered in the act of adultery or immediately before or after such an act, and the killing immediately follows such discovery." (*Chevalier*, 131 Ill. 2d at 72.) In the instant case, the "mere words" of defendant's girlfriend should not be countenanced as an adequate provocation. Defendant did not witness the sexual assault; he did not learn of the incident immediately after it occurred; and the killing did not immediately follow his discovery. In summary, because we find an absence of both sudden and intense passion and serious provocation, no instruction for second degree murder was required.

## II

■ Defendant next contends that his conviction for home invasion must be reversed because the murder and home invasion charges were based on the same physical act. Generally, a defendant may not receive multiple convictions and sentences which are based upon the same physical act. (*People v. Wilson* (1991), 224 Ill. App. 3d 364, 367, 586 N.E.2d 547.) However, multiple convictions are permissible when the offenses arise from a series of incidental or closely related acts and none of the offenses are lesser included offenses of the others. (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.) A lesser included offense arises when the greater offense includes every element of the lesser offense plus one or more elements. *People v. Govednik* (1986), 150 Ill. App. 3d 717, 722, 502 N.E.2d 276.

■ Neither home invasion nor first degree murder is a lesser included offense of the other. Each crime contains elements which are not elements of the other. (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 348, 580 N.E.2d 1209.) "The crime of home invasion requires an unauthorized entry into the home [citation], an element not present in murder. Similarly, murder, as charged here, requires an intentional killing [citation], an element not present in the crime of home invasion." *Trimble*, 220 Ill. App. 3d at 348.

Defendant's actions did not amount to a single physical act but consisted of numerous, closely related actions. Entering the victim's apartment was not the same physical act as firing the gun. Even though defendant's actions which resulted in the home invasion conviction were closely related to the actions resulting in the first degree murder conviction, the *Trimble* rationale controls, and the home invasion conviction is upheld.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.