FIRST DIVISION

No. 1-07-2229

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 04 CR 17334 |
| | ) | |
| BRENETTA INGRAM, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAMPKIN delivered the opinion of the court:

A jury convicted defendant, Brenetta Ingram, of first degree murder. Defendant contends she is entitled to a new trial because the trial court failed to comply with Supreme Court Rule 431(b) ((Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007). Defendant also contends the trial court interfered with her right to a fair and impartial jury during jury selection. Defendant finally contends the trial court erred by refusing to issue a jury instruction for second degree murder based on a sudden and intense passion resulting from serious provocation. We affirm.

FACTS

In June 2004, defendant had been staying at the apartment of the victim, Raymond Greene, with her daughter, Latasha, and her daughter's boyfriend, Shaun Patterson, for several months. In

the early morning hours of June 17, 2004, defendant learned that the victim planned to evict her from his apartment. Defendant became upset and participated in the stabbing and beating death of the victim in his apartment.

At trial, Detective Patrick Golden testified that he interviewed defendant on June 17, 2004. Defendant said that, early on that date, she was standing on the corner of Chicago Avenue and Hamlin Avenue in Chicago, Illinois, with Latasha, Patterson, and defendant's boyfriend, Walter Willis. Willis told the group that the victim owed him $50 to $60. Willis then left to retrieve the money from the victim. Willis later returned to the corner where the rest of the group remained. Willis reported that he went to the victim's nearby apartment located at 3804 W. Chicago Avenue, Chicago, Illinois, but the victim refused to repay the debt. Willis further reported that the victim was angry and planned to no longer allow defendant, Latasha, and Patterson to stay at the victim's apartment. Defendant said she became upset when she heard the news. Jimmie Booker then approached the group. Defendant informed Booker that the victim intended to evict defendant, Latasha, and Patterson.

Defendant said she, Booker, Latasha, and Patterson left the corner and went to the victim's apartment. Latasha knocked on the rear door of the victim's second-floor apartment. When the

victim opened the door, Latasha stepped to the side and Booker pushed the door open. The group entered the apartment and the victim demanded they leave. When they refused, the victim grabbed a baseball bat and swung it at defendant and Booker, but missed them. Defendant responded, "oh no, you are not going to hit me with that bat."

Booker and the victim then began struggling with the bat. Booker eventually gained control of the bat and told defendant he needed help fighting the victim. Defendant retrieved a knife from the kitchen sink and repeatedly stabbed the victim in the shoulders and back while the victim shouted, "I'm sorry. I'm sorry. Stop. Stop." The knife was approximately 8 to 10 inches long. Meanwhile, Booker repeatedly struck the victim with the bat. At some point, Booker dropped the bat and picked up a steel shovel. Booker then repeatedly hit the victim in the head and body with the shovel. The victim fell into a chair, begging defendant and Booker to stop hitting him. The victim then crawled on his hands and knees out his back door to an attached porch. Defendant followed, repeatedly hitting him with a wooden stick that she found. The victim eventually collapsed, motionless, on the rear porch.

When they were finished, defendant and Booker changed out of their bloodstained clothes and defendant changed out of her

bloodstained shoes.  They left the bloodstained items at the apartment.  Defendant, Booker, Latasha, and Patterson took some of the victim's belongings, including a television, a microwave oven, and a radio, and stashed the items several blocks from the apartment in a cinder-block structure with the intention to retrieve them later.  The group then split up.  Later that morning, defendant learned the victim had died.

Golden further testified that, after the interview concluded, he instructed other detectives to photograph the victim's apartment and collect the bloodstained clothing defendant and Booker had left behind.  Defendant, Latasha, and Patterson consented to giving biological samples.  Golden and his partner went to the cinder-block structure described by defendant.  Nothing was found there.  Golden and his partner returned to the police station and Golden called the State's Attorney's office.  Around 10:45 p.m., Assistant State's Attorneys (ASAs) Robert Robertson and Christine Frenzel arrived at the police station.  Golden was present when the ASAs interviewed defendant.  Defendant agreed to have her statement videotaped.

ASA Robertson testified that, when he first arrived at the police station on June 17, 2004, he spoke with Detectives Golden and Kevin Bore and reviewed the relevant police reports.  ASA

Robertson then interviewed defendant. The interview lasted approximately 30 minutes. Defendant described the events that transpired consistently with what she reported to the police. ASA Robertson also interviewed Latasha, Patterson, and Willis. After interviewing them, he returned to the room where defendant was located and ASA Frenzel took her videotaped statement. In addition, Latasha agreed to memorialize her witness statement. ASA Robertson took Latasha's handwritten statement. Afterward, ASA Robertson reviewed the statement with Latasha, and Latasha signed the bottom of each page of the statement.

ASA Frenzel testified that ASA Robertson conducted the initial interview of defendant and ASA Frenzel took defendant's videotaped statement. The videotaped statement was published to the jury.

In the videotaped statement,[1] defendant said she, Latasha, Patterson, and Booker went to the victim's apartment after Willis said the victim refused to repay the debt and planned to evict defendant, Latasha, and Patterson from his apartment. The group climbed the back stairs to the victim's second-floor door and Latasha knocked. When the victim opened the door, Booker pushed

---

[1]At the time, defendant was wearing a paper suit because her clothes were undergoing DNA testing. Defendant was given a jacket to wear because the room was cold.

his way inside and the rest of the group followed. The victim told Booker to leave, but Booker refused. The victim picked up a baseball bat and swung it. Defendant said the bat nearly hit her. Booker told the victim, "I'm not gonna let you hit [defendant]." Then, Booker attempted to gain control of the bat from the victim. Booker said, "don't let him get me, hit him," so defendant retrieved a "butcher" knife from the kitchen. The blade of the knife was approximately one foot long. Defendant stabbed the victim "several times" in the back, neck, and shoulder area. Meanwhile, Booker gained control of the bat and hit the victim with it. The victim retreated to a chair and sat down. He pleaded, "please, I'm sorry, stop, yes." At that time, Booker was hitting the victim with a shovel that he found behind the refrigerator. The victim then fell to the floor.

According to defendant's videotaped statement, Latasha gathered her "things" and Patterson grabbed his radio and "stuff." Latasha and Patterson left the apartment. Defendant said "there was blood everywhere," so she and Booker changed their clothes. Booker told defendant that he was "gonna take the TV and stuff." Booker took the bedroom television and handed Patterson, who had reappeared, the microwave to carry out of the apartment. Booker gave defendant a radio, which she kept. Booker told defendant he intended to sell the other items. He

said he would give defendant some of the profit. At that point, the victim was on the floor in the kitchen and began crawling toward the back porch. When the victim was on the back porch, defendant hit him with a stick. She described the stick as four feet long, two inches thick, and two inches wide. Defendant said "it must have come out the paneling of the door when they were fighting or somewhere in the kitchen area." Defendant was the last person to vacate the apartment and porch.

The group went to a nearby "vacant lot with a gray wooden little house with a[n] entrance window." Booker placed the victim's items in the "house." The group then split up. Defendant said she went out drinking. Later, defendant saw Booker with the victim's items in a shopping cart. She never saw the items after that. Defendant called Willis and told him what occurred at the victim's apartment. She reported that the victim was hurt. Defendant also told her godmother and Herman Johnson about the events that transpired at the victim's apartment. She admitted she stabbed the victim. Defendant knew the police were looking for her. Defendant said she planned to turn herself in. Defendant, however, wanted to wait to do so until she saw Willis. Willis arrived that afternoon and the police arrived shortly thereafter to arrest her.

Defendant admitted that, when she left the apartment, she

knew the victim was hurt. Defendant said the victim was bleeding. Defendant, however, did not call the police or an ambulance.

On July 3, 2004, Booker was brought to the police station. Golden interviewed him. Booker consented to give a biological sample.

Latasha, who was in custody on a contempt charge for failing to comply with a subpoena, testified that around 9 p.m. or 10 p.m. on June 16, 2004, she was standing near a corner on Chicago Avenue with defendant, Patterson, and Willis. At the time, she, defendant, and Patterson were staying with the victim in his apartment located across the street from where they were standing. Defendant told Patterson to go to the victim's apartment to retrieve his belongings because the victim was evicting them. Defendant, who was "a little tipsy and drunk," said she was going to confront the victim regarding rent money that she had paid. Defendant and Patterson left the corner to go to the victim's apartment.

Approximately 15 to 20 minutes later, Latasha walked over to the victim's apartment. She noticed defendant, Patterson, Willis, and Booker standing on the stairs leading to the back porch of the victim's second-floor apartment. Willis left the area and defendant, Patterson, and Booker began knocking on the

victim's door. The victim opened the door and told defendant she was not welcome inside. The victim closed the door, but then opened it when Latasha knocked. The victim instructed the group to retrieve their belongings, and all four of them entered the victim's apartment. Latasha and Patterson quickly grabbed their belongings from the living room. On her way out of the apartment, Latasha heard defendant arguing with the victim. She did not witness any physical fighting. Patterson left the apartment with Latasha. They both went to Latasha's father's house about three blocks away. Latasha did not see defendant again that night.

The next day, June 17, 2004, at about 7 a.m. or 8 a.m., she and Patterson were approached by the police. They went to the police station, where she spoke to Detective Golden and his partner. Latasha reported that, on the day in question, defendant knocked on the victim's door and Booker pushed the door open to gain entry. Latasha told the detectives that the victim asked everybody to leave. While she was gathering her belongings, Latasha witnessed Booker and the victim wrestling for control of a baseball bat. Booker obtained control and struck the victim with it. Latasha further told the detectives that defendant retrieved a shovel and beat the victim three or four times with it, while Booker was striking the victim with the bat.

Latasha also said she heard the victim scream, "please stop. I am sorry!" and saw him crawl onto his rear porch. Defendant said she was going to kill the victim.

Latasha further testified that she was interviewed by ASA Robertson. Latasha admitted she told ASA Robertson that, prior to going to the victim's apartment, defendant was angry. Defendant said she was going to get "one of her boys to beat [the victim's] a--." Latasha told ASA Robertson that she was outside the victim's apartment when defendant exited. Defendant had changed into different clothes from what she was wearing when they first arrived at the apartment.

Latasha admitted that she testified before the grand jury on June 18, 2004. At trial, Latasha testified that Patterson left the victim's apartment with his own radio. However, Latasha admitted that she testified before the grand jury that the radio was the victim's. During her grand jury testimony, Latasha said defendant took some of the victim's belongings. Latasha also told the grand jury that she saw her mother hit the victim with a "long brown stick." Latasha admitted that she told the detectives and the grand jury that, while defendant was hitting the victim with the shovel, she heard defendant yelling, "I am going to kill you."

On cross-examination, Latasha testified that, when she was

interviewed by defense counsel prior to trial, she said defendant was protecting herself from the victim at the time in question. During that pretrial meeting, Latasha said the victim grabbed defendant and defendant responded by hitting and kicking him to break free.

Detectives and evidence technicians collectively testified that the victim was found face down on his second-floor porch. He was surrounded by blood. Blood was found on the ground underneath the porch where it had poured through from above. A shovel was found near the landing to the second-floor porch. A serrated kitchen knife was found underneath the shovel. A butter knife was found by the victim's right hand. Inside, the apartment was in complete disarray. Bloodstains were found in a number of places, including on the stove and a countertop. The police recovered the following bloodstained items: a black pot, a black pair of shoes, a denture retainer, a blue shirt, a yellow shirt, a white shirt, a piece of wood measuring four feet in length, a baseball bat, the butter knife, the serrated knife, and the shovel.

Officer Nick Ribaudo, an evidence technician, testified that he photographed defendant at the police station. Defendant had a small cut on her pinky finger and a cut on the bottom of her foot. Ribaudo said he collected defendant's bra and denim

shorts, along with Patterson's clothes.

Lynette Wilson, a forensic scientist, testified that she tested a number of items for the presence of blood. Blood was found on defendant's bra and jean shorts, Patterson's tank top, Booker's shoes, the baseball bat, the piece of wood, the shovel, and the large serrated knife. The butter knife was not tested.

Ashlee Fulmer, a deoxyribonucleic acid (DNA) expert, testified that she analyzed the blood found on defendant's shorts, Patterson's tank top, and Booker's shoes. The blood on defendant's shorts matched the victim's DNA. The blood on Booker's shoes matched his own DNA. The blood on Patterson's tank top matched his own DNA.

Doctor Mitra Kalelkar, a medical examiner, testified that she performed the victim's autopsy. Kalelkar said the victim sustained 16 groups of injuries to his face and head, 3 injuries to the neck, 15 injuries to his trunk, 18 injuries to his upper extremities, and 6 injuries to his lower extremities. The injuries included abrasions, stab wounds, contusions, and lacerations. Kalelkar's internal examination revealed multiple hemorrhages beneath the scalp and a fractured skull.

Kalelkar testified that the wounds on the victim's head were consistent with blunt force trauma using a shovel or a similar object. The victim's stab or incised wounds were consistent with

the serrated knife found on the scene.  The victim's scrapes and abrasions could have been caused by the butter knife found on the scene.  The victim's rectangular-shaped injuries were consistent with the recovered piece of wood.  The recovered pot handle was a blunt object that could have caused abrasions, scrapes, or bruises.  Kalelkar opined that the victim's injuries were also consistent with being hit by a bat or any blunt object.  The victim's abrasions were consistent with someone crawling over a rough surface like wood or concrete.  According to Kalelkar, considerable force is required to fracture a skull.  Moreover, a fractured skull results in the loss of a large amount of blood.  Kalelkar opined that the victim died as a result of multiple blunt force and shock force injuries.  Kalkelkar added that she found a presence of a cocaine metabolite in the victim's blood.

The defense did not present any evidence.  Defense counsel argued that defendant was acting in self defense when she struck the victim.

The jury found defendant guilty of first degree murder and not guilty of armed robbery.  Defendant was sentenced to 45 years' imprisonment.

DECISION

I. Rule 431(b)

Defendant contends she was denied her right to a fair and

1-07-2229

impartial jury because the trial court failed to comply with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007).

We review a trial court's compliance with a supreme court rule *de novo*. People v. Lloyd, 338 Ill. App. 3d 379, 384, 788 N.E.2d 1169 (2003).

Defendant, however, concedes she failed to preserve her contention for purposes of our review by failing to object to the Rule 431(b) error. People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988) (in order to preserve an error for appellate review, the defendant must object at trial and include the alleged error in a posttrial motion). Defendant requests that we review the error under the plain error doctrine pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)).

The plain error doctrine allows us to review an issue affecting substantial rights despite forfeiture in either of two circumstances:

"First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent man was wrongly convicted. [Citation.] Second, where the

-14-

1-07-2229

> error is so serious that defendant was denied a
> substantial right, and thus a fair trial, a reviewing
> court may consider a forfeited error in order to
> preserve the integrity of the judicial process."
> People v. Herron, 215 Ill. 2d 167, 178-79, 830 N.E.2d
> 467 (2005).

Relying on the second Herron circumstance, defendant claims the trial court's failure to comply with Rule 431(b) denied her the basic guarantees for obtaining a fair and impartial jury. In order to conduct a plain error analysis, we must first determine whether error occurred. People v. Sims, 192 Ill. 2d 592, 621, 736 N.E.2d 1048 (2000).

Jury selection in this case began on June 25, 2007. Supreme Court Rule 431(b) was amended effective May 1, 2007. The amended rule places a *sua sponte* duty on trial courts to ensure compliance with Rule 431(b). People v. Anderson, No. 1-07-1768, slip op. at 14 (March 29, 2010) (Anderson II) (and cases cited therein). The amended rule provides:

> "The court *shall ask* each potential juror,
> individually or in a group, whether that juror
> *understands and accepts* the following principles: (1)
> that the defendant is presumed innocent of the
> charge(s) against him or her; (2) that before a

-15-

defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry *shall provide* each juror an *opportunity to respond* to specific questions concerning the principles set out in this section." (Emphasis added.) Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007. In his opening remarks, the judge here said:

"Under the law, [defendant] is presumed innocent of the charges against her, and that presumption remains with her throughout every stage of the trial, and during your deliberations on your verdict, and is not overcome unless from all the evidence, you are convinced beyond a reasonable doubt that she is guilty.

The State in this case *** has the burden to prove the guilt beyond a reasonable doubt, and that burden remains on the State throughout the entire case.  The

[d]efendant is not required to prove to you that she's innocent of the charges against her, nor is she required to present any evidence on her own behalf, so she can rely on the presumption of innocence."

Later, the judge continued:

"During the course of the trial, and more so at the end of it, I will tell you what the law is that applies to the case of People v. Brenetta Ingram. You as jurors are required to follow and obey the law, even in circumstances where you might say to yourself I personally disagree with it.

Anybody have any difficulty, any of the jurors out there, any problem following and obeying the law in this case?

Anybody think they have a problem following the law in the case of [defendant]?

No response to that question either.

There are certain things that apply in a criminal case, certain principles that apply to the case of [defendant] I will mention to you at this point.

One of those principles is the [d]efendant *** is presumed innocent of the charges against her, and that

presumption remains with [defendant] throughout the entire trial and is not overcome unless by your verdicts in the case, you conclude the State has proven [defendant] guilty beyond a reasonable doubt.

Does anybody have any difficulty or quarrel with the principle that [defendant] is presumed innocent of the charges against her and the State is required to prove her guilt beyond a reasonable doubt?

Again no response.

As part of the last question I just read to you, it should be obvious to you that the State in this case *** has the burden of proving the guilt of the [d]efendant beyond a reasonable doubt and that burden is on the State throughout the entire trial.  The [d]efendant is not required to prove to you that she's innocent of the charges against her.

Does anybody have any difficulty or quarrel with the principle the State is required to prove [d]efendant guilty beyond a reasonable doubt, the [d]efendant is required to prove nothing?

And again, no response.

And in conjunction with those two principles, they all kind of go hand in hand together is that

[d]efendant *** has the right to remain silent. She may choose sitting right here throughout the course of the entire trial, and not testify on her own behalf, and rely upon the presumption of innocence.

If that event should happen to occur, you as jurors can draw no inference for the fact she chooses to remain silent in favor of [defendant] or against [defendant] if she chooses to remain silent.

Does anybody have any difficulty or quarrel with the principle an accused person has the absolute right to remain silent and not testify?

Again no response.

If at the close of all the evidence in the case, any arguments by the lawyers, and instructions by me, you come to the conclusion that the State has proven the charge against [defendant] beyond a reasonable doubt, under those circumstances, anybody have any difficulty or quarrel with signing a verdict form which would say guilty?

No hands.

The other side of the coin equally applies, at the end of all the evidence in this case, arguments by the lawyers, instructions by me, you come to the conclusion

-19-

that the State has failed to prove beyond a reasonable doubt to your satisfaction the charge against [defendant], under those circumstances, anybody have any problem signing a verdict form which would say not guilty?

　　Again no response."

Then, while reading the jury instructions to the jurors after the close of evidence, the judge said:

"The defendant is presumed to be innocent of the charges against him of first degree murder type B and armed robbery.  This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilty [sic] of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The defendant is not required to prove his innocence.

The defendant is presumed to be innocent of the charges against him of first degree murder, type A. This presumption remains with him throughout every stage of the trial and during your deliberations on the

verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that the defendant is not guilty.

The State has the burden of proving the defendant is guilty of first degree murder, type A, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence.

The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

Defendant contends the trial court erred by failing to expressly inquire whether the venire understood and accepted that defendant need not present evidence in her defense and failing to provide the venire members with an opportunity to indicate their understanding and acceptance of that principle. We disagree.

We are mindful that the supreme court rules are not aspirational, but rather must be "obeyed and enforced as written." Bright v. Dicke, 166 Ill. 2d 204, 210, 652 N.E.2d 275 (1995). However, compliance with Rule 431(b) is not dictated by specific language. "Importantly, the rule speaks of 'principles' instead of questions. Likewise, the rule does not set out these principles in the form of questions to be posed *in haec verba*.

Nor does the rule provide for any 'magic words' or 'catechism' in order to satisfy its mandate." People v. Vargas, 396 Ill. App. 3d 465, 472, 469 N.E.2d 1062 (2009).

There is no dispute that the entire venire was advised of each of the four principles codified by Rule 431(b) and announced in People v. Zehr, 103 Ill. 2d 472 (1984). The venire members were later asked whether they had "any difficulty or quarrel with the principle" that defendant was presumed innocent, the State had the burden of proof, and defendant's decision not to testify could not be held against her. The judge did not expressly ask whether the venire members had "any difficulty or quarrel with the principle" that defendant need not present any evidence. Nevertheless, while explaining the burden of proof and establishing the venire members understanding and acceptance of that principle, the judge said "the [d]efendant is not required to prove to you that she [is] innocent of the charges against her. Does anybody have any difficulty or quarrel with the principle the State is required to prove [d]efendant guilty beyond a reasonable doubt, the [d]efendant is required to prove nothing?" Then, while establishing the venire's understanding and acceptance that no adverse influence could result from defendant's decision whether to testify, the judge said defendant could rely on the presumption of innocence. Furthermore, while

reading the jury instructions at the close of evidence, the trial judge readvised the empaneled jurors that "the defendant is not required to prove his innocence." We recognize that jury instructions will not cure existing prejudice against any of the Zehr principles (Zehr, 103 Ill. 2d at 477); however, taken in conjunction with the admonishments and interrogations done during *voir dire*, the trial judge complied with the dictates of Rule 431(b). We find that, by informing the venire that the defendant is not required to prove that she is innocent of the charges and that she is not required to prove anything, the trial court sufficiently ensured the venire understood and accepted that defendant was not required to provide evidence on her own behalf. Therefore, no error occurred.

Even assuming, *arguendo*, the trial court erred, we would find that the error was harmless. The facts of this case make a harmless error analysis appropriate, in sharp contrast to our recent decision in Anderson II.

In Anderson II, we found that the trial court's failure to ensure the majority of impaneled jury members knew, understood, and accepted all four of the Zehr principles amounted to reversible error. Anderson II, slip op. at 7-9, 17-18. In Anderson II, the trial judge apprised the venire of only three of the four Zehr principles in narrative form, not in questions.

Anderson II, slip op. at 8. The venire was told that the defendant was presumed innocent, that the State had to prove defendant guilty beyond a reasonable doubt, and that the defendant did not have to offer any evidence. Anderson II, slip op. at 8. The trial judge then asked the majority of impaneled jury members whether they would sign the appropriate verdict form if the State had or had not met its burden of proof. Anderson II, slip op. at 8-9. We concluded in Anderson II that the trial judge's inquiry was a " 'general question concerning the juror's willingness to follow the law.' " Anderson II, slip op. at 15, quoting 177 Ill. 2d R. 431, Committee Comments, at lxxix. The Anderson II trial judge never asked whether the jurors understood and accepted even the three principles announced.

Pursuant to supervisory order, in Anderson II, we reconsidered our decision in People v. Anderson, 389 Ill. App. 3d 1, 904 N.E.2d 1113 (2009) (Anderson I) (withdrawn) in light of People v. Glasper, 234 Ill. 2d 173, 917 N.E.2d 401 (2009). The question in Glasper was whether plain error occurred where the trial court refused to fulfill the defendant's request to advise the venire members that no adverse implication could be taken from the defendant's decision whether to testify. Glasper, 234 Ill. 2d at 189. The supreme court held the trial court erred in refusing to comply with the defendant's request, but found that

1-07-2229

the error was harmless. Glasper, 234 Ill. 2d at 200. The applicable version of Rule 431(b) in Glasper required a trial court to advise a venire of the Zehr principles only if requested by the defendant. Glasper, 234 Ill. 2d at 189. Therefore, the *sua sponte* duty imposed by the 2007 amendment was not in effect at the time of Glasper.

Upon reconsideration, we concluded the facts of Anderson were distinguishable from Glasper and amounted to reversible error. Anderson II, slip op. at 17-18, 20. Similar to Glasper, the Anderson judge failed to ascertain whether the majority of impaneled jury members understood and accepted that the defendant's decision whether to testify could not be held against him. Anderson II, slip op. at 17-18. However, unlike Glasper, the Anderson judge also failed to discern whether the majority of impaneled jury members understood and accepted the defendant's presumption of innocence, the State's burden of proof, or the defendant's ability not to present any evidence. Anderson II, slip op. at 17-18. In Anderson II, we found the trial judge's complete lack of compliance with Rule 431(b) resulted in reversible error because the judge failed to ensure the basic principles of a fair and impartial jury where there was no way to tell whether or not the jury was biased. Anderson II, slip op. at 17-18, 19-20.

-25-

1-07-2229

Here, in contrast, the trial judge provided the venire with all four <u>Zehr</u> principles and expressly secured the venire's understanding and acceptance of three out of four of them. The trial judge did not merely ask a " 'general question concerning the juror's willingness to follow the law.' " <u>Anderson II</u>, slip op. at 15, quoting 177 Ill. 2d R. 431, Committee Comments, at lxxix. In regard to the disputed principle, the trial judge advised the venire that "[d]efendant is not required to prove to you that she's innocent of the charges against her" and she "may rely on the presumption of innocence," and inquired whether the venire understood and accepted that "[d]efendant is required to prove nothing."

Moreover, the alleged Rule 431(b)(3) violation here would not automatically require reversal of defendant's conviction where there are no facts demonstrating the jury was biased and where no rational jury would have acquitted defendant. <u>People v. Chester</u>, 396 Ill. App. 3d 1067, 1075 (2010) (no plain error where the trial court established the jurors understood and accepted three of the four <u>Zehr</u> principles and the defense counsel advised the jurors on the remaining principle, *i.e.*, that a defendant's decision whether to testify could not be held against him, and questioned their understanding and acceptance of that principle). We recognize that defendant did not present any evidence;

-26-

however, we would find the error was harmless where the trial evidence overwhelmingly supported the jury's verdict.

Detective Golden and ASA Robertson both testified that defendant admitted stabbing and striking the victim repeatedly. Defendant's videotaped statement admitting the same was published to the jury. Latasha's trial testimony, handwritten statement, and grand jury testimony confirmed defendant's participation in the offense. The jury was able to accept or reject defendant's theory of self-defense. It was the jury's duty to make determinations of credibility of the witnesses, the weight to give witness testimony, and the reasonable inferences to be drawn from the evidence. People v. Evans, 209 Ill. 2d 194, 211, 808 N.E.2d 939 (2004). The jury rejected defendant's theory of self-defense in short order with the deliberation lasting less than 2 1/2 hours. We find overwhelming support in the record for the jury's verdict.

Therefore, even assuming, *arguendo*, the trial judge committed error, the error was harmless.

II. Judicial Interference With Jury Selection

Defendant contends the trial judge interfered with the selection of an unbiased jury when he warned panel members that they would be penalized if they changed their answers on their jury summons cards. The State responds that defendant failed to

preserve her contention for our review because she did not object to the alleged erroneous conduct during trial and did not include it in a posttrial motion. In the alternative, the State contends the trial judge did not abuse his discretion by making humorous remarks during jury selection.

Defendant concedes that she did not preserve her contention. As stated, we may review a forfeited error under the doctrine of plain error when (1) the evidence was close, regardless of the seriousness of the offense; or (2) the error was so serious as to deny a substantial right, and thus a fair trial, that the closeness of the evidence does not matter. Herron, 215 Ill. 2d at 178-79. We first must review whether error occurred. Sims, 192 Ill. 2d at 621.

The manner and scope of *voir dire* are within the discretion of the trial judge. People v. Williams, 164 Ill. 2d 1, 16, 645 N.E.2d 844 (1994). "The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias and prejudice." Williams, 164 Ill. 2d at 16. We will find the trial judge abused his discretion in conducting *voir dire* only where the judge's conduct "thwarted the selection of an impartial jury." Williams, 164 Ill. 2d at 16.

We now turn to defendant's substantive argument to determine whether the trial judge erred. During his opening remarks, the

1-07-2229

trial judge said:

"In order to determine your qualifications as jurors in this case, I'm going to ask you certain questions about yourselves. The lawyers can ask you questions thereafter if they'd like to do that also.

The questions that we ask you are not designed to pry in your private life or embarrass you. They are designed to afford the lawyers a chance to find out about you personally so they can be informed during the jury selection process.

We ask you to be frank, complete, and open in all your answers. That's how we ensure fairness to both sides."

While explaining a specific question asked on the jury summons card, the judge said:

"If you were arrested for something other than minor traffic, but you put down no, because you weren't quite sure what Question No. 10 meant, now that you know, you will tell us.

And that arrest could have been here in Chicago, anywhere in Illinois, some other state, some other country, anywhere.

We are not going to delve into the embarrassing

1-07-2229

details.  We think we are entitled to know the answer to that question, however.

If you put down no, you can change it to yes."

Later, the trial judge added:

"At this point, before we start actually, just so you have in mind, we all know we are here for a very serious purpose obviously.  My mother used to always tell me, great lady that she was, there is a time to laugh and a time to cry.

She did not mean that literally.  What she meant was time to make things light, time to take things seriously.  We know when those times are.  You will know when those times are.

I don't want you sitting with us three or four days glum from the time you first walk in and glum until you walk out.  So there may be a time during the course of your duties, proceedings today or tomorrow, next day, next day, whatever, I may say something I think might be somewhat humorous, you agree, you want to laugh, snicker, feel free to do [so].

If you don't think it's humorous, don't laugh just on my account.  I'm not doing that to demean the reason we are here.  We all know we are here for a very

serious purpose and that should be obvious, but if I can lighten your load for you a little bit, I might try and lighten your load for a little bit. It doesn't take way from the reason we are all here however."

Defendant specifically takes issue with exchanges the trial judge had with four jurors after they revealed they needed to change an answer on their jury summons cards. Prior to and between the exchanges in question, the trial judge asked the appropriate[2] venire members, "[q]uestions 9 through 16, all your answers are no. Any out of those you want to change in any way?" The first exchange in question was with venire member Passantino:

"Q. Questions 9 through 16, all your answers were no. Any answer out of those you want to change in any way?

A. Well, I was the victim of having my car stolen.

Q. How long ago was that?

A. Six years ago.

Q. Was anybody arrested or charged as far as you know of?

A. No.

---

[2]The judge did not ask the question when the venire member answered yes to the relevant questions on his or her jury summons card.

Q. Anything about that circumstance make you think you couldn't be fair to both sides in this case at all?

A. No.

Q. Anything else you wanted to change of those questions?

A. No.

Q. Did they tell you what happened to you if you changed an answer? When you change an answer on these forms, did they tell you what happens, when you change an answer?

A. Well, I thought about it.

Q. Did they tell you what happens when you change an answer?

A. No.

Q. You lose half your check.

A. Oh, that's all right.

Q. So instead of getting $17.20, you get $8.60. You can live with that?

A. I can live with that."

*Voir dire* continued. The second exchange in question was with venire member Hardy:

"Q. Someone in your immediate family party to a

lawsuit one time or another as well.  Who are we talking about
there?  The clock is ticking.  You are going to lose half your
money.

      A. My brother was."

After *voir dire* of the first panel was completed, the State
informed defense counsel and the judge that venire member Hardy
did not admit a 1986 arrest in Los Angeles, California.  Venire
member Hardy was recalled to chambers for the following exchange:

      "Q. On your jury card on Question No. 10 was the
one I indicated earlier today, the one have you been
accused, complainant, or witness in a criminal case,
you put down no.  Was there a time going back aways
[<u>sic</u>], maybe 1986 in Los Angeles?

      A. Oh yeah.

      Q. You were arrested for inflicting corporal
punishment on a spouse or cohabitant?

      A. Yes.

      Q. You didn't mention it.  Some reason you didn't
mention it?

      A. I didn't know.  Like I didn't get--I didn't
figure I was arrested.

      Q. There was no complaint ever filed on the case,

right?

  A. No.

  Q. So that's why you didn't mention it, nothing ever happened out of it?

  A. Right."

The defense excused venire members Passantino and Hardy.

 *Voir dire* continued with the second panel of venire members. The third exchange in question was with venire member Johnson:

  "Q. Victim of a crime, you answered yes, refers to what, Mr. Johnson?

  A. My house was burgled.

  Q. You got the word right. Where did you here that from? How long ago was the house burgled?

  A. That was 1983 or '84.

  Q. That wouldn't affect you if [you were] a juror in this case, would it?

  A. No.

  Q. Someone in your immediate family, very close friend, victim of crime, who does that apply to?

  A. Victim?

  Q. Victim, someone in your immediate family or very close friend, victim of a crime?

  A. That was me.

Q. Okay. So we've go to change your answer you put that down that was this talks about immediate family or close friend, so that answer is wrong about close friend?

A. Oh, no.

Q. So you lose half your check. You understand that?

A. I have already got it. That's possession nine-tenths of the law.

Q. All we do is put down stop payment. Party to a lawsuit at one time or another. What kind of lawsuit would that have been?

A. I filed, was part of a lawsuit against the Illinois Federation of Teachers.

Q. A long time ago?

A. Long time ago. It was a dispute.

Q. Involved in an accident where somebody was injured, auto accident of some sort?

A. Yes.

Q. How long ago would you say that was?

A. Let's see, that was in 1966.

Q. Okay. Just a little kid back then, weren't you?

A. Liked to say so."

The defense excused venire member Johnson.

*Voir dire* continued with the third panel of venire members. The fourth exchange in question was with venire member Carney:

"Q. Victim of a crime, you answered yes, refers to what?

A. My wallet was stolen.

Q. How long ago?

A. 18 years ago.

Q. 18 years ago?

A. Yeah.

Q. That would not affect you if you were a juror in this case, would it?

A. No.

Q. Someone in your immediate family, at least very close friend, victim of a crime also. Who were you talking about there?

A. I wrote yes. I didn't mean to.

Q. You understand the consequences?

A. I will give it back. Okay.

Q. I gave you the check already?

A. Yes."

Venire member Carney was excused because the jury had been

filled.

An exchange not challenged by defendant, but that gives additional context to the tone of *voir dire* was with venire member Korzum:

"Q. Questions 9 though 15, all answers were no. Any answer you want to change in any way?

A. No.

Q. Involved in an accident where somebody was injured; auto accident of some sort involved in an accident?

A. I don't even remember answering that question.

Q. Have you ever been involved in an accident where somebody was injured, you answered yes.  Should that be no?

A. Yeah.  That would be no.

Q. You understand the consequences?

A. You can take it back."

Yet another elucidating exchange occurred with venire member Paquette:

"Q. Questions 9 through 16, Miss Paquette, all your answers were no.  Any answer of those you want to change in any way?

A. No. 14.

Q. Someone in your immediate family a party to a lawsuit at one time or another?

A. Yes.

Q. Who was that?

A. My brother.

Q. And what kind of lawsuit would that have been?

A. Criminal.

Q. How was he involved in a criminal lawsuit?

A. He was the – he was being charged with something.

Q. How long ago was that would you say?

A. Three years ago.

Q. That's not pending anywhere now?

A. I don't think so.

Q. That wouldn't affect you if you were a juror, would it?

A. No."

It is clear from our review of the record that the trial judge was imparting humor into the proceedings when he "threatened" the loss of the jurors' earnings. Nevertheless, the venire members in the challenged exchanges were all excused from the jury pool. Moreover, contrary to defendant's claim, the responses of the challenged venire members, as well as the

-38-

remaining venire members, demonstrate they were not intimated by the judge's comments. The record reveals the venire members continued to verbally change their incorrect answers from their written jury summons cards. The trial judge encouraged as much in his opening remarks by telling the venire members that their *voir dire* responses should be "frank, complete, and open," while expressly noting that the jurors should change incorrect responses to a particularly confusing question from the jury summons card. Then, during each individual *voir dire*, the trial judge provided each venire member an opportunity to change his or her answers by specifically inquiring whether he or she wanted to change any answer in any way. We find no evidence that the trial judge "thwarted the selection of an impartial jury." Williams, 164 Ill. 2d at 16. Therefore, the trial judge did not abuse his discretion and there was no error. We need not conduct a plain error analysis; forfeiture applies to defendant's contention.

Defendant's reliance on People v. Brown, 388 Ill. App. 3d 1, 903 N.E.2d 863 (2009), is misplaced. In Brown, the trial judge reluctantly excused a potential juror who said he could not be fair and impartial to the defense in a drug-related trial because of past drug-related experiences. Brown, 388 Ill. App. 3d at 2-3. The trial judge, however, instructed the potential juror to return to court the next day to receive "an education as to how

the system works." Brown, 388 Ill. App. 3d at 3. The questions in Brown were whether the defendant forfeited his claim and whether the trial judge abused her discretion by punishing the potential juror. This court applied forfeiture and held that, while "the exchange was unnecessary in the way it occurred," there was no evidence that the trial judge thwarted the selection of an impartial jury. Brown, 388 Ill. App. 3d at 5, 10-11.

The facts of the case here are distinguishable. The trial judge's tone was clearly one of jest, unlike the stern punishment issued by the trial judge in Brown. Moreover, the targets of the challenged comments demonstrated no bias to the defense unlike the Brown juror who expressly disclosed that he could not be fair to the defense. Nevertheless, we find, similar to the Brown holding, that defendant forfeited review of his contention and the trial judge did not abuse his discretion.

We recognize, as defendant points out, that the rules of forfeiture are relaxed where the unpreserved error relates to a trial judge's conduct. People v. Young, 248 Ill. App. 3d 491, 498, 618 N.E.2d 1026 (1993). We, however, find no reason to relax forfeiture here. Defense counsel had ample opportunity to question every venire member after the trial judge completed his *voir dire*. Defense counsel never asked any of the potential jurors whether they failed to answer a question honestly for any

-40-

reason, including out of fear of the judge's response.

III. Provocation Instruction

Defendant contends the trial court erred by refusing to issue a jury instruction for second degree murder based on a sudden and intense passion resulting from serious provocation. The State contends the trial court did not abuse its discretion in refusing to issue the instruction where there was no evidence presented to support it.

A defendant is entitled to have the jury instructed on any legally recognized defense theory having some basis in the evidence. People v. Yarbrough, 269 Ill. App. 3d 96, 100, 645 N.E.2d 423 (1994). We review a trial court's determination whether to give a jury instruction for an abuse of discretion. People v. Tatum, 389 Ill. App. 3d 656, 673, 906 N.E.2d 695 (2009), citing People v. Sims, 374 Ill. App. 3d 427, 431, 871 N.E.2d 153 (2007). "However, whether a defendant has met the evidentiary minimum for a certain jury instruction is a matter of law and our review is *de novo*." People v. Tijerina, 381 Ill. App. 3d 1024, 1030, 886 N.E.2d 1090 (2008).

An individual commits second degree murder when he or she commits first degree murder, but a mitigating factor exists. 720 ILCS 5/9-2(a) (West 2004). The potential mitigating factors are the defendant, at the time of the killing, either: (1) acted

1-07-2229

under a sudden and intense passion resulting from serious provocation, but negligently or recklessly caused the death; or (2) believed he or she was acting in self defense. 720 ILCS 5/9-2(a)(1), (a)(2) (West 2004). "Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2004). The burden is on the defendant to prove by a preponderance of evidence the existence of either mitigating factor. 720 ILCS 5/9-2(c) (West 2004). "The only categories of serious provocation that have been recognized in Illinois are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse." People v. Leach, 391 Ill. App. 3d 161, 178-79, 908 N.E.2d 120 (2009).

Defendant contends the trial court erred in refusing to issue a second degree murder instruction where the evidence demonstrated she was seriously provoked into mutual quarrel or combat. Specifically, defendant contends she acted under a sudden and intense passion due to serious provocation because the victim evicted her from his apartment and swung a baseball bat at her in an attempt to bar her from retrieving her belongings. Defendant says she stabbed the victim with the knife and struck the victim with the stick because of the ensuing fight.

The evidence did not support the giving of a provocation instruction based on mutual quarrel or combat. " 'Mutual combat is a fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from combat.' " Leach, 391 Ill. App. 3d at 179, quoting People v. Neal, 112 Ill. App. 3d 964, 967, 446 N.E.2d 270 (1983). It is clear from the evidence, including defendant's police statement, videotaped statement, and trial testimony, as well as Latasha's various testimony, that defendant and the victim were not engaged in mutual quarrel or combat. Defendant and the victim were not on equal terms. When defendant began stabbing the victim with the serrated knife, the victim was engaged in a struggle for control of the baseball bat with Booker. At the time, the victim was not attempting to attack defendant.

Moreover, defendant failed to present any real evidence of serious provocation. People v. Austin, 133 Ill. 2d 118, 125, 549 N.E.2d 331 (1989) ("[d]efendant has the burden of proving there is at least 'some evidence' of serious provocation or the trial court may deny the instruction"). Booker and defendant pushed their way into the victim's apartment despite his refusal to grant them entry. Although defendant had been staying at the apartment for several months, the apartment ultimately belonged

-43-

to the victim. In an attempt to force the group out of the apartment, the victim picked up a baseball bat and swung it. Defendant's successive violent attacks using deadly weapons were out of proportion to the action the victim took to defend himself inside his home. People v. Austin, 133 Ill. 2d at 127 (mutual combat will not be found when the defendant's response is not proportionate to the provocation, especially where a deadly weapon is used). Defendant repeatedly stabbed the victim while Booker was also beating the victim with a baseball bat and then a shovel. When the victim had been beaten into submission and begged for his life, defendant followed him out to the porch and struck him with a piece of wood. The minor scrapes that defendant received do not demonstrate mutual combat, especially when compared to the extensive injuries the victim suffered.

Furthermore, Latasha's testimony confirmed there was no mutual quarrel or combat. In her handwritten statement, Latasha said defendant was angry at the victim for kicking her out of his apartment and planned to have "one of her boys to beat [the victim's] a--." Latasha added that defendant was the last person remaining on the victim's porch. When Latasha went to retrieve defendant, Latasha saw her hitting the victim with the shovel while the victim attempted to block the blows. At trial, Latasha testified that defendant was tipsy or a little drunk when she

went to the victim's apartment to confront him regarding her eviction. Latasha told the detectives and the grand jury that, while defendant was repeatedly hitting the victim with the shovel, defendant yelled, "I am going to kill you." Therefore, defendant was not acting under sudden and intense passion as a result of sufficient provocation. Defendant went to the apartment with the intention to at least confront the victim, if not incite a physical beating, because she learned that she was being evicted. Even if the victim grabbed defendant and held her, as Latasha testified on cross-examination, defendant's response of stabbing and beating him with multiple objects to the point of injury as described by Dr. Kalelkar was not proportionate. Austin, 133 Ill. 2d at 126-27.

Therefore, the trial court's refusal to issue a provocation instruction was proper.

CONCLUSION

We affirm defendant's conviction and sentence.

Affirmed.

HALL, P.J., concurs.

GARCIA, J., specially concurs.

1-07-2229

JUSTICE GARCIA, specially concurring:

I agree with the majority that the trial judge complied with Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007) during jury selection. Slip op. at 22. Consequently, I see no reason to address the defendant's claim in the alternative: "[E]ven assuming, arguendo, the trial judge committed error, the error was harmless." Slip op. at 22. In any event, I cannot agree with the majority's alternative analysis, which contrasts this case with this court's decision in Anderson II because I dissented in Anderson II. People v. Anderson, No. 1-07-1768, slip op. at 21 (March 29, 2010) (Garcia, J., dissenting).

Therefore, I specially concur in the result.

1-07-2229

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

BRENETTA INGRAM,

Defendant-Appellant.

No. 1-07-2229

Appellate Court of Illinois
First District, FIRST DIVISION

May 17, 2010

Justice Bertina E. Lampkin authored the opinion of the court:

Presiding Justice Hall concurs.

Justice Garcia specially concurs.

Appeal from the Circuit Court of Cook County.
The Hon. Stanley J. Sacks, Judge Presiding.

**COUNSEL FOR APPELLANT**
Michael J. Pelletier, State Appellate Defender, Chicago, IL 60601
Patricia Unsinn, Deputy Defender
OF COUNSEL: Christopher Kopacz


**COUNSEL FOR APPELLEE**
Anita Alvarez, Cook County State's Attorney, Chicago, IL 60602
OF COUNSEL: James E. Fitzgerald and Peter Fischer

1-07-2229